Matthew C. Helland, CA State Bar No. 250451
Daniel S. Brome, CA State Bar No. 278915
helland@nka.com
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery Street, #810
San Francisco, CA  94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Paul J. Lukas, MN Bar No. 022084X*
lukas@nka.com
NICHOLS KASTER, PLLP
    *pro hac vice application forthcoming
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

*Attorneys for Plaintiffs and the proposed Class*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Rachael Wright Winsor and Nicole Beichle, individually and on behalf of the RingCentral, Inc. Welfare Benefits Plan, and on behalf of similarly situated persons, | Case No. 3:21-cv-227 |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF** |
| v. | |
| Sequoia Benefits and Insurance Services LLC and Gregory S. Golub, | **(1)  Prohibited Transactions under ERISA (29 U.S.C. § 1106)** |
| Defendants. | **(2)  Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** |

**NATURE OF THE ACTION**

1.      Plaintiffs Nicole Beichle and Rachael Wright Winsor ("Plaintiffs"), individually and on behalf of the RingCentral, Inc. Welfare Benefits Plan (the "RingCentral Plan"), and on behalf of a class of similarly situated persons (the "Class") and their employee welfare benefit plans (together with the RingCentral Plan, the "Plans"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Sequoia Benefits and Insurance Services LLC ("Sequoia") and Gregory S. Golub ("Golub") (together, "Defendants"). As described herein, Defendants are fiduciaries of the Plans under a Multiple Employer Welfare Arrangement (MEWA) established by Defendants called the Tech Benefits Program ("Tech Benefits" or the "Tech Benefits MEWA"). Defendants have collected more than $100 million from the Plans in transactions prohibited by ERISA, saddled the Plans with other excessive costs, and breached their fiduciary duties under ERISA with respect to the Plans, to the detriment of the Plans and their participants. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plans, and obtain equitable and other relief as provided by ERISA.

**PRELIMINARY STATEMENT**

2.      Employee benefit plans are a vital source of well-being and security for Americans. *See* 29 U.S.C. § 1001 ("[T]he continued well-being and security of millions of employees and their dependents are directly affected by these plans."). Thus, ERISA "imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition" of employee benefit plan assets. H.R. CONF. REP. 93-1280 (Aug. 12, 1974).

3.      According to multiple federal agencies, MEWAs are a frequent source of ERISA non-compliance and abuse—a problem that has continued since ERISA was enacted more than 40 years ago. A MEWA is any arrangement in which a person offers welfare benefits to employees of two or more unrelated employers, except such arrangements that are collectively bargained or that arise in other narrowly defined contexts with historically robust employee protections. Relative to operators of single employer and other non-MEWA arrangements, MEWA fiduciaries are more

likely to be motivated by interests contrary to those of plan participants. When a MEWA fiduciary acts carelessly or in its own interest, it violates ERISA.

4.     Such is the case here. Sequoia and its principal member, Golub, created the Tech Benefits MEWA and granted themselves control over the costs charged to the Plans and their own compensation. Defendants then used that discretion to enter into "kickback" arrangements with insurers that provide for the payment of commissions to Defendants as a percentage of the amount collected by these insurers from the Tech Benefits MEWA. Because Defendants' commissions are a function of the cost of benefits—expenses that Defendants have a fiduciary obligation to negotiate in favor of the Plans—Defendants are perversely incentivized to cause the Plans to pay more in order to increase Defendants' own compensation. During the statutory period, Defendants received over $100 million in commissions from Tech Benefits insurers, and the Plans paid grossly excessive and unnecessary administrative costs. These payments were excessive, unreasonable, and unlawful.

5.     Defendants violated ERISA by engaging in prohibited self-dealing (Count I) and by failing to prudently and loyally control the Plans' expenses in the sole interest of participants (Count II). *See* 29 U.S.C. §§ 1106(a)-(b) and 1104(a)(1)(A)-(B). On behalf of participants in the Tech Benefits MEWA and their respective Plans, Plaintiffs seek to recover losses to the Plans caused by Defendants' violations of ERISA, restitution of unlawful payments, disgorgement of profits received by Defendants, and other appropriate relief.

## JURISDICTION AND VENUE

6.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in employee benefit plans may pursue a civil action to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132(a)(3). Plaintiffs also bring this action on behalf of the proposed Class pursuant to Federal Rule of Civil Procedure 23.

7.     This case presents a federal question under ERISA, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8.       Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the violations giving rise to this action occurred in this District and Defendants may be found in this District.

9.       Pursuant to Local Rule 3-2, this case is properly assigned to the San Francisco Division or the Oakland Division because the violations giving rise to this action occurred in San Mateo County.

## THE PARTIES

### Plaintiffs

10.      Plaintiff Nicole Beichle ("Beichle") has participated in the RingCentral Plan since 2016 and is a current participant in the RingCentral Plan. Beichle receives medical, vision, dental, and life insurance through the Tech Benefits MEWA and the RingCentral Plan, and makes contributions from her pay for medical, vision, and dental coverage. Beichle has suffered financial injury as a result of the unlawful conduct described herein because her contributions would be less if not for Defendants' violations of ERISA. Beichle has been further injured by the unlawful conduct described herein because the improper and excessive charges associated with employer contributions made on her behalf exhaust funds that would otherwise be available for employee benefits and compensation.

11.      Plaintiff Rachael Wright Winsor ("Winsor") participated in the RingCentral Plan between 2013 and 2017. Winsor and her then spouse received medical and life insurance through the RingCentral Plan and Tech Benefits, and Winsor made contributions from her pay for the spousal medical benefit. Winsor has suffered financial injury as a result of the unlawful conduct described herein because her contributions would have been less if not for Defendants' violations of ERISA. Winsor was further injured by the unlawful conduct described herein because the improper and excessive charges associated with employer contributions made on her behalf exhausted funds that would otherwise be available for employee benefits and compensation.

### The RingCentral Plan and the Plans

12.      The RingCentral Plan is one of more than 180 employer-sponsored Plans that offers welfare benefits to employees through the Tech Benefits MEWA. Each individual Plan is an

-3-

"employee welfare benefits plan" within the meaning of 29 U.S.C. § 1002(1). Each Plan is sponsored by a tech industry employer (as determined by Standard Industry Classification codes) and meets certain additional conditions established by Defendants. When Plans enroll and participate in Tech Benefits, Defendants assume discretionary authority over a broad range of functions of each Plan (see *infra*, ¶¶ 16-24). Collectively, the Plans provide welfare benefits to more than 30,000 workers in the tech industry.

**Defendants**

13.  Defendant Sequoia is a California limited liability company and licensed insurance agency in California. Sequoia's principal office is in San Mateo, California. Sequoia was organized as a single member limited liability company, with Defendant Golub as the sole member. In recent unrelated litigation, Sequoia stated that it now has two members. Golub remains the managing member. Sequoia was formerly known as Sequoia Benefits LLC and sometimes does business under the name Sequoia Consulting Group.

14.  Sequoia is the administrator of Tech Benefits, and assumes fiduciary control of various functions on behalf of participating Plans (see *infra,* ¶¶ 16-24). *See* 29 U.S.C. § 1002(21)(A)(i),(iii). As a fiduciary, and as an entity of which 50% or more of the capital interest is owned by Defendant Golub, who is also a fiduciary (see *infra*, ¶ 15), Sequoia is also a party-in-interest to the Plans. *See* 29 U.S.C. § 1002(14)(G)(iii).

15.  Defendant Golub is a natural person and resident of California. Golub controls Sequoia as its managing member. On information and belief, Golub owns, directly or indirectly, more than 50% of the capital interest in Sequoia.[1] Golub also styles himself as the President and CEO of Sequoia. Golub serves as the trustee of assets of the Plans contributed to the Tech Benefits MEWA. As trustee, Golub exercises broad fiduciary discretion over the assets of the Plans (see *infra*, ¶¶ 16-24). *See* 29 U.S.C. § 1002(21)(A)(i),(iii). As a fiduciary, and as a person owning at

---

[1] Defendant Golub is Sequoia's original member and one of two current members. The second member is not identified in organization documents available through the California Secretary of State's website and is not otherwise known to Plaintiffs. Based on Golub's position as the original member and his continuing control of Sequoia, it is reasonable to infer that Golub retains more than 50% of the capital interest in Sequoia.

least 10% of the capital interest in Sequoia, which is a service provider to the Plans, Golub is also a party-in-interest to the Plans. *See* 29 U.S.C. § 1002(14)(I).

## **THE TECH BENEFITS MEWA – FIDUDCIARY CONTROL**

16.     Defendants established the Tech Benefits MEWA effective January 1, 2013. Golub signed the governing document as the "trustee" of the program, and participating employers sign an adoption agreement assenting to these terms. The terms dictate participation requirements for employers and allocate responsibility for managing the program.

17.     Employers must be tech industry employers headquartered in California with 20 or more full-time employees. They must enroll a minimum of 75% of eligible employees in medical benefits through Tech Benefits and pay 75% of contributions for single coverage or 50% for family tiers. Each participating employer is therefore deemed to have established its own ERISA-covered employee welfare benefit plan by participating in Tech Benefits.[2]

18.     The program terms divide discretionary authority between the trustee, the program administrator, and the administrators of the individual Plans. Golub is the trustee by his position as the chief executive of Sequoia. The program administrator is appointed by Golub. Although not named in the program terms, public filings show that Golub appointed Sequoia as the program administrator. The administrator of each individual Plan is the employer.[3] All three—the trustee

---

[2] Defendants initially claimed "plan" MEWA status, see *infra*, ¶ 34, but later conceded that Tech Benefits is not a "plan" in its own right, as Defendants are not a bona fide association of participants' employers. Therefore, each participating employer is deemed to have established its own employee welfare benefit plan. *See* DOL MEWA Guide, at 8-9 ("Where no bona fide group or association of employers exists, the benefit program … would not itself constitute an ERISA-covered welfare plan; however, the Department would view each of the employer-members … as having established separate, single employer welfare benefit plans subject to ERISA."). Defendants also have claimed that Tech Benefits is "fully insured," but this claim is not true either. Fully insured benefits are 100% guaranteed through contracts with licensed insurance companies, see 29 U.S.C. § 1144(b)(6)(D), but Tech Benefits requires the employers to cover benefits payable after the employer withdraws from Tech Benefits, "including payments for ongoing claims and conditions occurring or expenses incurred before the termination date."

[3] Employers are assigned duties like distributing disclosures and determining the employee share of contributions (subject to minimums established by Golub). While the Tech Benefits terms include broad language that purports to allocate "complete authority and responsibility" for benefits under the program to the employers, such provisions apply only to those areas of discretion reserved to employers. In other areas, employers have no discretion, having assigned full discretion to

-5-

(Golub), program administrator (Sequoia), and the administrators of individual Plans (employers)—are "named fiduciaries" according to the program terms.

19.     Golub's trustee powers are broad. Golub is authorized to "do all acts and things … which the Trustee deems advisable to carry out the purposes of the Program." The purpose of the program is to "provid[e] benefits for … employees[.]" In this regard, the terms state that the program must be operated "for the exclusive benefit of employees, their dependents and other beneficiaries."

20.     Golub is specifically authorized to:

- "[C]ontrol and manage the program and its assets";

- Determine the benefits available to Plans, and add, change, or eliminate benefits;

- Direct the program administrator to purchase insurance contracts on behalf of the Plans;

- Appoint and supervise the program administrator (who controls and manages the operation and administration of the program "subject to the express directions of the Trustee");

- Approve contribution rates for the Plans (which are initially determined by the program administrator);

- Hold contributions from the Plans in trust for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of the program;

- Determine the advisability, manner, and amount of payments made from Plan contributions held in trust;

- Determine, together with the program administrator, the program administrator's compensation; and

- Retain advisers, consultants, or other firms as needed to carry out his duties.

---

Defendants by agreeing to the Tech Benefits terms (e.g., determining Defendants' compensation and determining other expenses to be charged against Plan contributions).

21.     The terms provide that Golub "will serve without compensation." However, Golub receives substantial income from his control of the Plans through his capital interest in Sequoia and through commissions paid to himself personally. *See infra*, ¶¶ 38, 43.

22.      Sequoia, as program administrator, has broad powers to "control and manage the program and its assets" and "control and manage the operation and administration of the Program."

23.     Sequoia is specifically authorized to:

- Interpret and apply all provisions of the program and the benefits available to the Plans;

- Purchase insurance contracts to fund the selected benefits on behalf of the Plans, as directed by Golub;

- Determine contribution rates for the Plans (subject to final approval by Golub);

- Determine, in coordination with Golub, its own compensation; and

- Prepare and file reports with government agencies, and prepare disclosures to participants (to be distributed by employers).

24.     Defendants exercised these duties and other discretionary duties in fact. Defendants determine the contributions necessary for each Plan, collect those contributions from participating employers and employees, and hold these funds in a common trust fund maintained by Golub. Additionally, Defendants select the insurance providers for each benefit available to the Plans and negotiate the amount that these insurance providers will be paid from trust assets for providing benefits, along with determining other program costs to be paid from the Plans' contributions. During the relevant time, Defendants made direct payments from the common trust fund to medical, dental, vision, and life insurance providers and to a third-party claims administrator.

25.     Defendants' compensation for providing these services is not fixed by any provision of the program terms. Instead, Defendants have exercised discretion in setting their own compensation by arranging for commissions to be paid to themselves from the insurers, with whom Defendants are required to negotiate in the interest of the Plans' participants. These commissions are a percentage of the Plans' funds transferred to the insurers by Defendants from the common

trust fund. As explained below, this arrangement creates a perverse incentive for Defendants to allow (or cause) the cost of the program's benefits to increase in order to increase the amount of compensation paid to Defendants.

### ERISA PROHIBITED TRANSACTIONS

26.     ERISA prohibits certain transactions "likely to prove inimical to the interest of participants." *See* H.R. Conf Rep. 93-1280 (Aug. 12, 1974) (statement of Hon. Al Ullman). Prohibited transactions are "per se" violations of ERISA. *Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) (quoting *Gilliam v. Edwards,* 492 F.Supp. 1255, 1264 (D.N.J. 1980)).

27.     Under ERISA's prohibited transaction rules:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> > (A)   sale or exchange, or leasing, of any property between the plan and a party in interest;
> >
> > (B)   lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C)   furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan;
> >
> > (E)   acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29  U.S.C. § 1106(a).

28.     The prohibited transactions rules further provide:

> [A] fiduciary with respect to a plan shall not—
>
> > (1)   deal with the assets of the plan in his own interest or for his own account,
> >
> > (2)   in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

-8-

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).[4]

29.     Under these rules, a welfare plan fiduciary, including a MEWA fiduciary acting on behalf of participating plans, is prohibited from receiving commissions from insurance companies with whom the fiduciary places coverage. *See Patelco*, 262 F.3d at 911 ("It is undisputed that [the welfare plan fiduciary] received commissions from insurance companies with whom he placed Patelco's coverage, in violation of § 1106(b)(3)."); *Acosta v. WH Administrators, Inc.*, 449 F. Supp. 3d 506, 520 (D. Md. 2020) (fiduciary administering multiple plans under common terms violated section 1106(b)(3)—as well as the duty of loyalty, see *infra*, ¶¶ 31-32—by "accepting commissions from third parties", including from a "carrier relating to insurance policies that [the fiduciary] placed with the [participating] Plans."); *Scalia v. Kentucky Bankers Assoc., et al*., Case No. 3:20-cv-00636-CHB, Consent Order and Judgement, ¶¶ 2-3, ECF No. 7 (W.D. Ky. Oct. 13, 2020) (ordering repayment and re-evaluation of contracts after DOL alleged MEWA operator received prohibited commissions from insurers (*see id.*, Compl., ¶¶ 7, 9, 48-64, ECF No. 1)).

30.     Prohibited transactions likewise may occur if a welfare plan fiduciary, including a MEWA fiduciary, exercises discretion over his own compensation or contracts with entities he owns on behalf of participating plans. *See Chao v. Graf*, 2002 WL 1611122, at *10 (D. Nev. Feb. 1, 2002) (granting preliminary injunction against MEWA fiduciaries who "set their own compensation and … used their discretionary authority and control to cause the [participating plans] … to contract with … entities owned and controlled by [the MEWA fiduciaries].").

---

[4] A § 1106(a) prohibited transaction described in Paragraph 27 may be entitled to an exception under 29 U.S.C. § 1108. *See* 29 U.S.C. § 1106(a) ("Except as provided in section 1108 of this title …"). A § 1106(b) prohibited transaction descried in Paragraph 28 may not. *See Patelco*, 262 F.3d at 910 ("But 29 U.S.C. § 1106(b), which prohibits fiduciary self-dealing, makes no mention of the exceptions in § 1108. … We conclude that the [claimed 1108 exception] does not apply to fiduciary self-dealing.").

## ERISA FIDUCIARY DUTIES

31.     In addition to the foregoing prohibited transaction rules, ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
>     (i)      Providing benefits to participants and their beneficiaries; and
>
>     (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

32.     These ERISA fiduciary duties are "the highest known to the law", see *Howard v. Shay*, 100 F.3d 1481, 1488 (9th Circ. 1996), and apply to MEWA fiduciaries who exercise discretion over assets and benefits on behalf of participating plans. *See* US Dep't of Labor, *Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation*, at 15 (2013) ("In doing so, the persons operating the MEWA would be performing fiduciary acts that are governed by ERISA's fiduciary provisions.") [hereinafter "DOL MEWA Guide"];[5] *see also Graf*, 2002 WL 1611122, at *10 (finding that MEWA fiduciary likely violated section 1104(a)(1) duties of prudence and loyalty in course of self-dealing and through payment of excessive fees).

## HISTORY OF MEWA NON-COMPLIANCE AND ABUSE

33.     MEWAs have a long history of non-compliance and abuse. When not properly managed, a MEWA may constitute a "for-profit entrepreneurial enterprise" that operates contrary to the employee benefit protections of ERISA. *See Graf*, 2002 WL 1611122, at *5.

34.     Congress first attempted to remedy abuse by MEWAs in 1983 by removing or limiting preemption of certain state insurance laws. *See* Pub. L. 97-473, § 302 (Jan. 14, 1983); U.S.

---

[5]*Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

GOV'T ACCOUNTABILITY OFFICE, *Employee Benefits: States Need Labor's Help Regulating Multiple Employer Welfare Arrangements*, at 2 (1992) [hereinafter "GAO MEWA Report"]. A MEWA may be considered "an employee welfare benefit plan" in its own right (a "plan MEWA") or a collection of multiple such plans (a "non-plan MEWA"), depending on who sponsors the MEWA.[6] Preemption from state insurance laws available to *plan* MEWAs in ERISA's original text was appealing to unscrupulous operators and led to false claims of plan status that frustrated state insurance commissioners. *See* GAO MEWA Report, at 2; DOL MEWA Guide, at 3. Congress attempted to remove the incentive to falsely claim plan status, and help states co-regulate MEWAs, by eliminating or limiting preemption for plan MEWAs. *Id.*; 29 U.S.C. § 1144(b)(6). This legislation created a federal definition of MEWA:

> The term "multiple employer welfare arrangement" means an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except that such term does not include any such plan or other arrangement which is established or maintained--
>
> (i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements,
>
> (ii) by a rural electric cooperative, or
>
> (iii) by a rural telephone cooperative association.

29 U.S.C. § 1002(40)(A).[7]

---

[6] *See* DOL MEWA Guide, at 5-10, 15, 24. A plan MEWA is a MEWA established by a qualified association of employers or an employee organization (for example, a labor union). *Id.*, at 5-10. A non-plan MEWA is a MEWA established by anyone else. *Id.*, at 15, 24. The distinction determines whether a MEWA is subject to all ERISA requirements that apply to "employee benefit plans". *Id.*, at 11. A MEWA's plan or non-plan status does <u>not</u> determine whether its operator is subject to ERISA's fiduciary duties or prohibited transaction rules. An operator of a non-plan MEWA is considered a fiduciary of participating plans, and subject to fiduciary liability under ERISA, to the extent it exercises discretion over the assets and administration of those plans. *Id.*, at 5; *see also* GAO MEWA Report, at n. 2; DOL MEWA Guide, at 15; *WH Administrators*, 449 F. Supp. 3d at 516-17; *Graf*, 2002 WL 1611122, at *5-*6, *8-*9. Such is the case here. *See supra*, ¶¶ 16-24.

[7] Multiple employers that are part of the same control group are treated as a single employer and not regulated as MEWA operators. 29 U.S.C. § 1002(40)(B)(i)-(iii). The exception for rural electric and telephone cooperatives is based on the "vital" service provided by these plan operators to cooperative employees nationwide and the absence of need for additional regulation. *See* H.R. Rep. 102-50 (July 15, 1991).

-11-

35.     The 1983 non-preemption measure did not significantly reduce MEWA abuse. The MEWA format continued to attract unscrupulous operators. *See* GAO MEWA Report, at 2-3. States often could not identify corrupt MEWAs before participants were harmed. *See id.* In response, Congress enacted further remedial legislation that specifically authorized the Secretary of Labor to, among other things, require non-plan MEWAs that offer medical care to file periodic public reports.[8] *See* Pub. L. 104-191, tit. I, § 101(e)(1) (Aug. 21, 1996). However, the Secretary determined that the MEWA problem required a more comprehensive reporting regime and used other authority granted by Congress to expand the reporting requirement to all MEWAs, and even those claiming exception from MEWA treatment. *See* 65 Fed. Reg. 7152, at 7153 (Feb. 11, 2000) (interim rule); 68 Fed. Reg. 17494 (Apr. 9, 2003) (final rule).

36.     Despite these reporting requirements, MEWA violations continued to be common. *See* 76 Fed. Reg. at 76223 ("Despite the reporting requirements, many … MEWA abuses ... persist[.]").  In response, Congress enacted new criminal penalties for certain misrepresentations made by MEWA operators and enhanced the reporting regime by requiring certain MEWA operators to register with the Secretary before doing business in any state (among other things). *See* Pub. L.  111-148, tit. 6, §§ 6604-06 (Mar. 23, 2010). The Secretary of Labor again used the new legislation and other powers to broaden the registration requirement to all MEWAs and operators claiming exception, and to require additional disclosures. *See* 76 Fed. Reg. at 76223-27 (proposed rule); *see also* 78 Fed. Reg. 13781 (Mar. 1, 2013) (final rule).

37.     Notwithstanding the persistent efforts by Congress and the Secretary of Labor to force MEWAs to comply with ERISA and other laws, MEWAs continue to disregard important protections for participants—including ERISA's prohibition against fiduciary commissions. *See Scalia v. Medova Healthcare Financial Group LLC, et al.*, Case No. 2:20-cv-2624-TC-ADM (D. Kans.), Compl. ¶¶ 96 & 98(d)-(g), ECF. No. 1 (Dec. 9, 2020) (alleging that MEWA fiduciaries violated ERISA by, among other things, receiving commissions from program insurer);[9] *Kentucky*

---

[8] *See* 76 Fed. Reg. 76222, at 76222-23 (Dec. 6, 2011) ("The original MEWA reporting requirement … was enacted in response to the [GAO MEWA Report].")

[9] The Medova Healthcare MEWA case is ongoing and there has been no finding or admission of liability.

*Bankers Assoc.*, Consent Ord. & Judg., ¶¶ 2-3, ECF No. 7 (ordering restitution after DOL alleged that MEWA fiduciaries violated ERISA by, among other things, receiving commissions from insurers); *see also WH Administrators, Inc.*, 449 F. Supp. 3d at 510-12 & 520.[10]

### **DEFENDANTS' VIOLATIONS OF ERISA**

### **Defendants Received Improper Commissions**

38.     As noted above, Defendants act as fiduciaries of the Plans with authority to arrange benefits, negotiate the cost to the Plans, and determine Defendants' own compensation. *See supra*, ¶¶ 16-24. Defendants may not use their authority to benefit themselves, see *supra*, ¶¶ 26-32, yet Defendants accept kickbacks from the insurance providers with whom they place the Plans' coverage. Defendants have received, and continue to rake in, substantial commissions from the Plans' insurers (Golub in his own name and through his capital interest in Sequoia)—more than $100 million in aggregate in the last six years.[11]

39.     What is more, Defendants receive commissions as a percentage of the cost to the Plans, providing a perverse incentive for Defendants to cause the Plans to pay more to increase their own compensation. Accepting these commission payments from the Plans' counterparties violates ERISA's prohibited transaction rules and fiduciary duties. *See supra*, ¶¶ 26-32.[12]

40.     Defendants' largest commission is paid by the Tech Benefits MEWA's primary medical benefit provider, Anthem. This commission is 6% of the total cost to the Plans (including Anthem's fees). Defendants received the following commissions from Anthem since 2015:[13]

---

[10] The court found that WH Administrators was a fiduciary of more than 100 unrelated plans that paid contributions to common accounts controlled by WH Administrators and received benefits provided or arranged by WH Administrators under standard documents—although the DOL did not specifically allege that WH Administrators was a "MEWA" operator. *See* 449 F. Supp. 3d at 510-12 & 516-17. In any case, WH Administrators' receipt of commissions as a fiduciary to the plans violated ERISA. *Id.*, at 520.

[11] ERISA contains a six-year statute of limitations. *See* 29 U.S.C. 1113(1).

[12] There are appropriate means for a fiduciary, including a MEWA fiduciary, to be paid—and even to profit—for providing a fiduciary service. A party independent of the fiduciary receiving the compensation should have authority to determine the compensation that the plans will pay, and the compensation must not be influenced by matters that are within the receiving fiduciary's control. This is not what Defendants did.

[13] Sequoia's 2020 commission has not been publicly reported to date.

|  | Anthem Commission Amount |
|---|---|
| 2019 | $21,609,135 |
| 2018 | $17,703,435 |
| 2017 | $15,548,423 |
| 2016 | $12,426,675 |
| 2015 | $8,326,934 |

41.     The structure of the Anthem commission (a percentage of the cost to the Plans) and the drastically escalating amounts show that Defendants are using their discretion to benefit themselves in violation of ERISA's prohibited transaction rules and their fiduciary duties.  Based on these figures, it is also reasonable to infer that Defendants are not simply tracking direct and necessary expenses and instead are receiving a substantial windfall. Defendants' commission percentage has remained fixed even as the cost of Anthem's coverage more than doubled between 2015 and 2019. An expense reimbursement program would reflect certain efficiencies as Sequoia enrolls more Plans and participants in the program, resulting in a reduction in Sequoia's direct and necessary expenses as a percentage of the cost of coverage. Yet Sequoia has continued to receive the same rate, resulting in a commission that has more the doubled without regard to Defendants' actual cost of administering the program.

42.     Defendants have received nearly $100 million in commissions from Anthem *alone* since 2015 (including an estimated 2020 commission that is similar to 2019). Yet these are not the only commissions Defendants receive as fiduciaries of the Plans. Sequoia and Golub also receive commissions in connection with other benefits obtained on behalf of the Plans.

43.      Plan records show that Defendants were paid substantial additional sums from insurance providers as commissions and fees for the sale of other medical, dental, vision, and life insurance coverage that Defendants arranged for the Plans. Defendants received contributions for these benefits into the Tech Benefits common trust account and then directed them to insurance providers on behalf of the Plans, who in turn paid Defendants a commission. Certain of these commissions were paid to Sequoia, and others were paid in Golub's name personally. The

-14-

estimated amount of such additional commissions since 2015 is up to $6 million per year or more.[14]

44.      Defendants' scheme to obtain discretion over their own compensation, arrange coverage with certain providers on behalf of the Plans, and then receive a percentage of the cost of coverage from those providers as a kickback has proven to be wildly lucrative for Defendants. However, it is contrary to the interests of the participants that Defendants are bound to represent.

**Defendants Authorized Excessive Administrative Fees**

45.      Defendants also authorized excessive administrative fees to be paid to insurance providers. As described above, Defendants determine the contribution rates for each Plan. Contribution rates include administrative fees kept by the insurance provider and not used to pay for medical or other care. Defendants are required to negotiate these rates on behalf of the Plans, yet Defendants have a selfish interest in causing the Plans to pay higher rates because some of the amounts paid to insurance providers are kicked back to Defendants (see *supra*, ¶¶ 39-41).  The increase in rates between 2015 and 2019 shows that Defendants have succumbed to their conflict of interest and failed to advocate prudently and loyally for the Plans.

46.      For example, Anthem, as the Plans' primary medical benefit provider, receives fees calculated based on the number of covered participants. Anthem's fee per covered participant appears to have increased significantly on both an aggregate basis *and per-participant basis* between 2015 and 2019:[15]

|  | Anthem Fee | Anthem Fee Per Covered Participant[16] |
|---|---|---|
| 2019 | $25,460,941 | $859 |
| 2018 | $18,777,971 | $716 |
| 2017 | $17,256,867 | $722 |
| 2016 | $13,653,897 | $591 |
| 2015 | $9,702,622 | $544 |

[14] These commissions are identified in filings by the individual Plans and are subject to reporting deficiencies and non-reporting by the Plans.
[15]  The 2020 Anthem fees have not been publicly reported.
[16] Based on the average of the number of participants covered at the end of the year and the end of the prior year.

47.     As Defendants have enrolled more and more Plans and participants in coverage through Anthem, certain efficiencies and negotiating leverage in favor of the Plans are expected. However, the cost to the Plans has followed the opposite trajectory. As Defendants have placed more busines with Anthem, its rates have gone up. Defendants are obligated to work diligently to limit these fees, but Defendants are conflicted because they get paid more if Anthem gets paid more.  Defendants have carelessly and selfishly failed to limit these fees, to the detriment of the Plans' participants.

### PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' VIOLATIONS

48.     Plaintiffs did not have knowledge of all material facts (including, among other things, the scope of Defendants' responsibilities, Defendants' compensation structure, Defendants' compensation amounts, or administrative fees paid to insurance providers) necessary to understand that Defendants engaged in prohibited transactions and breached their fiduciary duties in violation of ERISA until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to Tech Benefits and the Plans because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

### CLASS ACTION ALLEGATIONS

49.     Plaintiffs bring this action individually and on behalf of the RingCentral Plan, and as a class action on behalf of participants in other Plans, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

50.     Plaintiffs assert their claims in Counts I - II on behalf of the following class: [17]

> All participants and beneficiaries in employee welfare benefit plans that participated in the Tech Benefits MEWA since January 11, 2015.

51.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plans have had around 30,000 participants during the applicable period.

---

[17] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

52.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plans, and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members with regard to the Plans. Defendants managed the Plans in the same manner through the Tech Benefits MEWA and therefore Defendants' improper actions affected all Plan participants similarly.

53.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation, including ERISA class actions. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

54.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.   Whether Defendants are fiduciaries of the Plans;

      b.   Whether Defendants engaged in prohibited transactions by engaging in the conduct described herein;

      c.   Whether Defendants breached ERISA's fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

      d.   The proper measure of monetary relief; and

      e.   The proper form of equitable and injunctive relief.

55.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

56.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual participants, as a practical matter, would be dispositive of the interests of other participants or would substantially impair or impede their ability to protect

-17-

their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other participants in the Plans.

57.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Prohibited Transactions
### 29  U.S.C. § 1106(a)-(b)

58.    As alleged in this Complaint, Defendants are fiduciaries and parties-in-interest to the Plans.

59.    Acting in fiduciary capacities, Defendants arranged for the Plans to make contributions to a trust fund; determined the amount of those contributions based on certain costs within Defendants' authority to negotiate; directed periodic payments from the trust fund to insurance providers to cover those costs; and received a percentage of such payments from the insurance providers on a periodic basis as commissions. In doing so, Defendants also were empowered by discretion over their own compensation. Defendants acted for their own benefit, and

in fact received funds for their own accounts, and had interests that better aligned, in theory and in the result, with the Plans' counterparties.

60.     These transactions were prohibited by ERISA. Defendants dealt with the Plans' assets in their own interests and for their own accounts, in violation of 29 U.S.C. § 1106(b)(1), acted in transactions involving the Plans on behalf of parties whose interests were adverse to those of the Plans, in violation of 29 U.S.C. § 1106(b)(2), and received consideration for their personal accounts from parties dealing with the Plans in connection with transactions involving assets of the Plans, in violation of 29 U.S.C. § 1106(b)(3). Defendants also violated 29 U.S.C. § 1106(a)(1)(D) by knowingly transferring Plan assets to themselves indirectly as parties-in-interest to the Plans and by knowingly using plans assets for their own benefit as parties-in-interest.

61.     As a direct and proximate result of these prohibited transactions, the Plans indirectly paid Defendants more than $100 million. The Plans and participants suffered the loss of these monies and opportunity costs associated with the payment of these monies to Defendants, rather than to the Plans or participants in the Plans.   Defendants are liable to make good to the Plans all losses suffered as a result of Defendants' prohibited transactions, make restitution of the prohibited commission and fee payments, and to disgorge all profits associated with their unlawful conduct. In addition, Class members are entitled to further equitable and injunctive relief on account of these prohibited transactions.

**<u>COUNT II</u>**
**Breach of Fiduciary Duties**
**29 U.S.C. § 1104(a)(1)(A)-(B)**

62.     As alleged in this Complaint, Defendants are fiduciaries of the Plans and are subject to ERISA's fiduciary duties.

63.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants in their administration of Plans and in their determination of expenses to be borne by the Plans (among other things).

64.     Defendants have breached these duties, and continue to breach these duties, by engaging in the conduct described herein. Defendants have acted in their own interest and without

due care by accepting unlawful commissions and fees, and by failing to control other expenses that increase Defendants' compensation but have an adverse effect on the Plans.

65. As a consequence of Defendants' breaches of fiduciary duty, the Plans and participants suffered millions of dollars in losses due to improper and excessive payments to Defendants and insurance providers. Defendants are liable to make good to the Plans all losses suffered as a result of Defendants' fiduciary breaches, make restitution of improper commissions and other charges, and disgorge all profits resulting from Defendants' unlawful conduct, in addition to further equitable and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the RingCentral Plan, and as representatives of the Class of persons defined herein and on behalf of their Plans, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have engaged in prohibited transactions and breached their fiduciary duties in the manner described in the Complaint;

D. An order compelling Defendants to personally make good to the Plans all losses that the Plans incurred as a result of the prohibited transactions and breaches of fiduciary duties described above;

E. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F. Other equitable relief to redress Defendants' practices and to enforce the provisions of ERISA as may be appropriate, including restitution of commissions and other compensation to Defendants, disgorgement of Defendants' profits, and appointment of an independent fiduciary or fiduciaries to exercise discretion with regard to Defendants' compensation and other administrative expenses of the Plans;

G. An award of pre-judgment interest;

1

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

2

3

I.      An award of such other and further relief as the Court deems equitable and just.

4

5

Dated: January 11, 2021                              **NICHOLS KASTER, LLP**

6

By:    /s/ Matthew C. Helland

7

Matthew C. Helland

8

Attorney for Plaintiffs and the proposed Class

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND EQUITABLE RELIEF