Matthew C. Helland, CA State Bar No. 250451
Daniel S. Brome, CA State Bar No. 278915
helland@nka.com
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery Street, #810
San Francisco, CA  94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Kai H. Richter, MN Bar No. 0296545*
krichter@nka.com
Brock J. Specht, MN Bar No. 0388343*
bspecht@nka.com
Paul J. Lukas, MN Bar No. 022084X*
lukas@nka.com
Grace I. Chanin, MN Bar No. 0399969*
gchanin@nka.com
NICHOLS KASTER, PLLP
   *admitted *pro hac vice*
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878

*Attorneys for Plaintiffs and the proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Rachael Wright Winsor and Nicole Beichle, individually and on behalf of the RingCentral, Inc. Welfare Benefits Plan, and on behalf of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>Sequoia Benefits and Insurance Services LLC and Gregory S. Golub,<br><br>Defendants. | **Case No. 3:21-cv-227**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**(1)  Prohibited Transactions under ERISA (29 U.S.C. § 1106)**<br>**(2)  Breach of Fiduciary Duties under ERISA (29 U.S.C. § 1104)** |

3:21-cv-00227-JSC

## NATURE OF THE ACTION

1.      Plaintiffs Nicole Beichle and Rachael Wright Winsor ("Plaintiffs"), individually and on behalf of the RingCentral, Inc. Welfare Benefits Plan (the "RingCentral Plan"), and on behalf of a class of similarly situated persons (the "Class") and their employee welfare benefit plans (together with the RingCentral Plan, the "Plans"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Sequoia Benefits and Insurance Services LLC ("Sequoia") and Gregory S. Golub ("Golub") (together, "Defendants"). As described herein, Defendants are fiduciaries of the Plans under a Multiple Employer Welfare Arrangement (MEWA) established by Defendants called the Tech Benefits Program ("Tech Benefits" or the "Tech Benefits MEWA"). Defendants have collected more than $100 million from the Plans in transactions prohibited by ERISA, saddled the Plans with other excessive costs, and breached their fiduciary duties under ERISA with respect to the Plans, to the detriment of the Plans and their participants. Plaintiffs bring this action to remedy this unlawful conduct and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      Employee benefit plans are a vital source of well-being and security for Americans. *See* 29 U.S.C. § 1001 ("[T]he continued well-being and security of millions of employees and their dependents are directly affected by these plans."). Thus, ERISA "imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition" of employee benefit plan assets. H.R. CONF. REP. 93-1280 (Aug. 12, 1974).

3.      According to multiple federal agencies, MEWAs are a frequent source of ERISA non-compliance and abuse—a problem that has continued since ERISA was enacted more than 40 years ago. A MEWA is any arrangement in which a person offers welfare benefits to employees of two or more unrelated employers, except such arrangements that are collectively bargained or that arise in other narrowly defined contexts with historically robust employee protections. Relative to operators of single employer and other non-MEWA arrangements, MEWA fiduciaries are more likely to be motivated by interests contrary to those of plan participants. When a MEWA fiduciary acts carelessly or in its own interest, it violates ERISA.

-1-                                    3:21-cv-00227-JSC
AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

4.      Such is the case here. Sequoia and its principal member, Golub, created the Tech Benefits MEWA and granted themselves control over the costs charged to the Plans and their own compensation. Defendants then used that discretion to enter into "kickback" arrangements with insurers that provide for the payment of commissions to Defendants as a percentage of the amount collected by these insurers from the Tech Benefits MEWA. Because Defendants' commissions are a function of the cost of benefits—expenses that Defendants have a fiduciary obligation to negotiate in favor of the Plans—Defendants are perversely incentivized to cause the Plans to pay more in order to increase Defendants' own compensation. During the statutory period, Defendants received over $100 million in commissions from Tech Benefits insurers, and the Plans paid grossly excessive and unnecessary administrative costs. These payments were excessive, unreasonable, and unlawful.

5.      Defendants violated ERISA by engaging in prohibited self-dealing (Count I) and by failing to prudently and loyally control the Plans' expenses in the sole interest of participants (Count II). *See* 29 U.S.C. §§ 1106(a)-(b) and 1104(a)(1)(A)-(B). On behalf of participants in the Tech Benefits MEWA and their respective Plans, Plaintiffs seek imposition of a constructive trust on Defendants' profits for the benefit of the Plans' participants; an order requiring distribution of Defendants' profits to participants in proportion to their contributions; an order for an accounting of profits obtained by Defendants and surcharging Defendants for the amount of those profits; an order requiring Defendants to make good to the Plans all losses suffered as a result of Defendants' violations of ERISA; and other appropriate relief.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in employee benefit plans may pursue a civil action to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132(a)(3). Plaintiffs also bring this action on behalf of the proposed Class pursuant to Federal Rule of Civil Procedure 23.

7.      This case presents a federal question under ERISA, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

-2-                                        3:21-cv-00227-JSC

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

8.      Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the violations giving rise to this action occurred in this District and Defendants may be found in this District.

9.      Pursuant to Local Rule 3-2, this case is properly assigned to the San Francisco Division or the Oakland Division because the violations giving rise to this action occurred in San Mateo County.

### THE PARTIES

#### Plaintiffs

10.      Plaintiff Nicole Beichle ("Beichle") is a current participant in the RingCentral Plan. She has received medical, vision, disability, life, and accidental death and dismemberment insurance through the RingCentral Plan since at least 2018, and dental insurance since 2019. In at least 2018 and 2019, the RingCentral Plan obtained Beichle's insurance coverages through the Tech Benefits Program.[1]

11.      Beichle was enrolled in the Anthem EPO medical insurance plan in 2018. The total contribution for Beichle to receive insurance under this plan in 2018 was $359.90 twice a month. Beichle's share of the contribution was $18 twice a month.

12.      In 2019, Beichle switched to the Anthem PPO 250 medical insurance plan. The total contribution for Beichle to receive insurance under this plan in 2019 was $371.70 twice a month. Beichle's share of the contribution was $45.25 twice a month.

13.      In 2019, Beichle added the Guardian PPO dental insurance plan. The total contribution for Beichle to receive insurance under this plan in 2019 was $20.42 twice a month. Beichle's share of the contribution was $1.02 twice a month.

---

[1] Defendants have stated that the RingCentral Plan fully withdrew from Tech Benefits in 2020. Beichle has attempted to confirm with RingCentral, as certain coverages historically provided and paid for through Tech Benefits, like dental and vision, have not changed.  As of the date of this filing, Beichle has not received a response. Plaintiffs will take Defendants' representation regarding RingCentral's status at face value for purposes of the Amended Complaint.  Plaintiffs do not assert claims for prospective injunctive relief, reserving their right to seek leave to amend if the facts turn out to be different than Defendants have represented.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

14. In 2018 and 2019, Beichle was enrolled in the Vision Service Plan. The total contribution for Beichle to receive insurance under this plan was $5.34 twice a month in 2018 and $4.29 twice a month in 2019. Beichle's share of the contribution was $0.27 twice a month in 2018 and $0.22 twice a month in 2019.

15. Beichle asked RingCentral's benefits department how her share of the contributions was determined. RingCentral responded but did not identify a specific formula or set of factors for determining the employee share. RingCentral cited "various factors and discussion" and stated that "[t]he company contributes 80-90% of the cost for employee medical benefits." RingCentral's approach is consistent with guidance issued by Defendants. Defendants advise employers that a "common strateg[y]" for determining the employee contribution is to require employees to pay 90% of the required contribution for their own coverage and 75% for family members.

16. Plaintiff Rachael Wright Winsor ("Winsor") participated in the RingCentral Plan between at least 2014 and 2017. She received medical insurance through the RingCentral Plan from 2014 through 2017; she received dental insurance for herself in at least 2017; and she received medical and dental insurance for her then spouse in at least 2017. The RingCentral Plan obtained Winsor's insurance coverages through the Tech Benefits Program.

17. In 2017, Winsor was enrolled in the Anthem PPO 250 medical insurance plan for herself and her then spouse. Winsor's share of the total contribution for this insurance was $105.16 twice a month.

18. In 2017, Winsor was also enrolled in the Guardian PPO dental insurance plan for herself and her then spouse. Winsor's share of the total contribution for this insurance was $9.18 twice a month.

19. Winsor is not a current RingCentral employee and has not been able to access records regarding the total contributions for her insurance. Winsor asked RingCentral's benefits department for the total contribution amounts. As of the date of filing of this Amended Complaint, Winsor has not received the information requested.

20. In each instance described above in which Plaintiffs contributed a share of the total contribution required to obtain insurance through the RingCentral Plan and Tech Benefits, the

following procedure applied: Plaintiffs paid their share of the contribution to RingCentral. RingCentral then forwarded the total contribution, including Plaintiffs' share, to Defendants. Defendants deposited the total contribution into a trust account maintained by Defendants in the name of the Tech Benefits Program. Defendants then paid the total contribution amounts to Anthem, Guardian, and VSP to cover claim reimbursements, administrative fees, and/or premium charges to guarantee payment of RingCentral Plan benefits by the insurer. Defendants distributed the contributions to insurers on a weekly or monthly basis and did not hold contributions in reserve or otherwise generate and retain a surplus year-to-year. Pursuant to agreements between the insurers and Defendants, the insurers paid Defendants commissions as a percentage of the amounts received from Tech Benefits. In the case of Anthem, the commission was 6% of all amounts received by Anthem, and the commission was calculated and paid monthly.[2] Defendants then retained the commissions for their own profit and did not return the commissions to the Tech Benefits trust, the RingCentral Plan, RingCentral, or Plaintiffs.[3]

22. Based on the above facts, Beichle's contributions funded $91.08 of Defendants' Anthem commission in 2018-2019. Winsor's contributions funded $151.43 of Defendants' Anthem commission in 2017.

22. If Plaintiffs are successful in recovering Defendants' commissions on behalf of the Plans and the Class, Plaintiffs will likely receive a distribution or credit equal to the portion of the recovered commissions funded by their contributions. Under applicable law, this action may be achieved by court order or, alternatively, by fiduciary constraints on the disposition of recovered funds by an administrator. *See Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1410 & 1418-19 (9th Cir. 1988) (finding that "the court may impose a

---

[2] At this stage, Plaintiffs have not discovered the precise rate for Defendants' commissions from Guardian and VSP.

[3] Plaintiffs also were required to pay certain fixed dollar co-pays and percentage co-insurance for services under their respective plans. For example, in 2019, Beichle's Anthem PPO 250 plan required her to pay 10% of the cost of in-patient surgeries after the deductible. Plaintiffs do not assert any claims related to point-of-sale or point-of-service charges paid by participants outside of the benefits provided by the Plans. Plaintiffs' claims are limited to costs and commissions borne from contributions paid to fund the Plans and used purchase insurance to cover the benefits provided by the Plans.

constructive trust on a fiduciary's alleged ill-gotten profits and distribute those profits to plan participants and beneficiaries"); *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) ("[The fiduciaries] claim that the harm suffered by [plaintiffs] is unlikely to be redressed because any relief ordered would be awarded to the Plan rather than to the plaintiffs individually. … We doubt that such a decision would be consistent with the fiduciaries' duty to act in the interest of participants. … [T]he fiduciaries should, in accord with their statutory duty of care, strive to allocate any recovery to the affected participants[.]").

23.     The common law of trusts, on which ERISA's remedies provision is based, also authorizes courts to distribute recovered funds to trust beneficiaries. *See* Restatement (Third) of Trusts § 100 cmt. a(2) (2012) ("The court …, may allocate some or all of the surcharged amount directly to one or more of the beneficiaries to the extent the court has the information necessary to do so."); *Murdock*, 861 F.2d at 1411 ("Section 409(a) reflects ERISA's adoption of common law trust principles."). If a court does not distribute the recovery, the common law binds trustees to retain or distribute the recovery "as appropriate to the terms and circumstances of the trust." *Id.*

24.     In light of these authorities, numerous factors support proportional distributions or credits to the participants that funded Defendants' commissions, including but not limited to:

- Defendants' self-dealing;

- Defendants' ability to control any recovery under their trust agreement with the Plans, and Defendants' authority under that agreement to pay any recovery to themselves;

- Employers' apparent disinclination to handle Plan funds themselves, having hired Defendants as trustees for their Plans;

- Participants' role in funding Defendants' commissions through their contributions to their Plans;

- The nature of the harm, as the funds were improperly retained by Defendants in connection with insurance purchased in past policy years;

- The magnitude of the harm, as administrative costs of distributing a recovery in a class case like this are typically less than $5 per participant, and Plaintiffs and the Class stand to recover significantly more;

- The nature of the Plans, which raise funds through regular contributions and purchase insurance to pay benefits, rather than building up reserves or generating investment income; and

- The financial condition of the Plans and Tech Benefits, as Plaintiffs are not aware of any accumulated liabilities or obstacles to raising new funds to purchase new or ongoing insurance coverage.

25.    These same factors also support proportional distributions or credits to the participants that funded the Plans' losses incurred due to excessive administrative fees.

### The RingCentral Plan and the Plans

26.    The RingCentral Plan is one of more than 180 employer-sponsored Plans that offers welfare benefits to employees through the Tech Benefits MEWA. Each individual Plan is an "employee welfare benefits plan" within the meaning of 29 U.S.C. § 1002(1). Each Plan is sponsored by a tech industry employer (as determined by Standard Industry Classification codes) and meets certain additional conditions established by Defendants. When Plans enroll and participate in Tech Benefits, Defendants assume discretionary authority over a broad range of functions of each Plan. *See infra* ¶¶ 35-45. Collectively, the Plans provide welfare benefits to more than 30,000 workers in the tech industry.

### Defendants

27.    Defendant Sequoia is a California limited liability company and licensed insurance agency in California. Sequoia's principal office is in San Mateo, California. Sequoia was organized as a single member limited liability company, with Defendant Golub as the sole member. In recent unrelated litigation, Sequoia stated that it now has two members. Golub remains the managing member. Sequoia was formerly known as Sequoia Benefits LLC and sometimes does business under the name Sequoia Consulting Group.

28.    Sequoia is the administrator of Tech Benefits and assumes fiduciary control of various functions on behalf of participating Plans (see *infra,* ¶¶ 35-45). *See* 29 U.S.C. § 1002(21)(A)(i),(iii). As a fiduciary, and as an entity of which 50% or more of the capital interest is owned by Defendant Golub, who is also a fiduciary (see *infra* ¶ 29), Sequoia is also a party-in-interest to the Plans. *See* 29 U.S.C. § 1002(14)(G)(iii).

29. Defendant Golub is a natural person and resident of California. Golub controls Sequoia as its managing member. On information and belief, Golub owns, directly or indirectly, more than 50% of the capital interest in Sequoia.[4] Golub also styles himself as the President and CEO of Sequoia. Golub serves as the trustee of assets of the Plans contributed to the Tech Benefits MEWA. As trustee, Golub exercises broad fiduciary discretion over the assets of the Plans (see *infra* ¶¶ 35-45). *See* 29 U.S.C. § 1002(21)(A)(i),(iii). As a fiduciary, and as a person owning at least 10% of the capital interest in Sequoia, which is a service provider to the Plans, Golub is also a party-in-interest to the Plans. *See* 29 U.S.C. § 1002(14)(I).

30. Despite having duties to act as fiduciaries on behalf of the Plans, see *infra* ¶¶ 35-45, Defendants have held, at all times since 2015, insurance licenses issued by the California Department of Insurance (CDI) to "transact on behalf of" the insurance companies from whom the Plans obtain insurance coverage. This violates ERISA's prohibition against representing both sides to a transaction, see 29 U.S.C. § 1106(b)(2), an important ERISA protection founded on core trust principles. *See Michoud v. Girod*, 45 U.S. 503, 555 (1846) ("[A]gents … [are] not allowed to unite the two opposite characters of buyer and seller."); *Purchase v. A. Safe Deposit & Tr. Co.*, 87 A. 444, 447 (N.J. Ch. 1912) "[A] real estate agent who for commissions makes a sale of property for a company, which property the company holds in trust, must be a man outside of the company."), *aff'd*, 91 A. 1070 (N.J. 1914); *Rowland v. Kable*, 6 S.E.2d 633, 642–43 (Va. 1940), ("[Trustees] cannot … enter into nor authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits.").

### THE TECH BENEFITS MEWA – FIDUDCIARY CONTROL

31. Defendants established the Tech Benefits MEWA effective January 1, 2013. Golub signed the governing document as the "trustee" of the program, and participating employers sign

---

[4] Defendant Golub is Sequoia's original member and one of two current members. The second member is not identified in organization documents available through the California Secretary of State's website and is not otherwise known to Plaintiffs. Based on Golub's position as the original member and his continuing control of Sequoia, it is reasonable to infer that Golub retains more than 50% of the capital interest in Sequoia.

3:21-cv-00227-JSC

an adoption agreement assenting to these terms. A copy of the program document and adoption agreement is attached as Exhibit 1.

32. The program document dictates participation requirements for employers. Tech Benefits employers must be tech industry employers headquartered in California with 20 or more full-time employees. The employers do not need to be associated with one another. The employers also must enroll a minimum of 75% of eligible employees in medical benefits and pay at least 75% of contributions for single coverage or 50% for family coverage.

33. Based on the factors described in the paragraph above, each participating employer is therefore deemed to maintain its own ERISA-covered employee welfare benefit plan by participating in Tech Benefits. *See* US DEP'T OF LABOR, *Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation*, at 8-9 (2013) ("Where no bona fide group or association of employers exists, the benefit program … would not itself constitute an ERISA-covered welfare plan; however, the Department would view each of the employer-members … as having established separate, single employer welfare benefit plans subject to ERISA.") ("DOL MEWA Guide");[5] 29 C.F.R. § 2510.3-1(j)(1) (exception from "plan" status for certain welfare benefit plans offered to employees not available if the employer contributes to the cost).

34. The program document also: (1) establishes a procedure for funding the benefits provided by the participating Plans, see Ex. 1, § 7.02; (2) describes how responsibility for operation and administration of the Plans may be allocated between fiduciaries, or delegated to others, see *id.* §§ 3.01-3.06; and (3) provides that Golub may amend the program document at any time, see *id.* § 9.01. The program document is therefore a "plan instrument" under 29 U.S.C. § 1102 with respect to each participating Plan that adopts it. *See Mull for Mull v. Mot. Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017) (holding that a "plan" is the collection of documents that satisfy "ERISA's requirements for constituting a plan" under section 1102(b)); *Wright v. Oregon Metallurgical Corp.*, 222 F. Supp. 2d 1224, 1230-31 (D. Or. 2002) ("[T]he Ninth Circuit has held

---

[5] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

an ERISA plan may incorporate provisions from a trust agreement, the plan may consist of more than one document, and several documents collectively may comprise the governing plan instruments."), *aff'd*, 360 F.3d 1090 (9th Cir. 2004); *see also Horn v. Berdon, Inc. Defined Ben. Pension Plan*, 938 F.2d 125, 127-28 (9th Cir. 1991) ("[T]here is no requirement that documents claimed to collectively form the employee benefit plan be formally labelled as such.").

35.    The program terms divide discretionary authority between the trustee, the program administrator, and the administrators of the individual Plans. Golub is the trustee by his position as the chief executive of Sequoia. The program administrator is appointed by Golub. Although not named in the program terms, public filings show that Golub appointed Sequoia as the program administrator. The administrator of each individual Plan is the employer. All three—the trustee (Golub), program administrator (Sequoia), and the administrators of individual Plans (employers)—are "named fiduciaries" according to the program terms.

36.    Employers are assigned duties like distributing disclosures and determining the employee share of contributions (subject to minimums established by Golub). While the Tech Benefits terms include broad language that purports to allocate "complete authority and responsibility" for benefits under the program to the employers, such provisions apply only to those areas of discretion reserved to employers. In other areas, employers have no discretion, having assigned full discretion to Defendants by agreeing to the Tech Benefits terms (e.g., determining Defendants' compensation and determining other expenses to be charged against Plan contributions).

37.    Golub's trustee powers are broad. Golub is authorized to "do all acts and things … which the Trustee deems advisable to carry out the purposes of the Program." The purpose of the program is to "provid[e] benefits for … employees[.]" In this regard, the terms state that the program must be operated "for the exclusive benefit of employees, their dependents and other beneficiaries."

38.    Golub is specifically authorized to:

- "[C]ontrol and manage the program and its assets";

- Determine the benefits available to Plans, and add, change, or eliminate benefits;

- Direct the program administrator to purchase insurance contracts on behalf of the Plans;

- Appoint and supervise the program administrator (who controls and manages the operation and administration of the program "subject to the express directions of the Trustee");

- Approve contribution rates for the Plans (which are initially determined by the program administrator);

- Hold contributions from the Plans in trust for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of the program;

- Determine the advisability, manner, and amount of payments made from Plan contributions held in trust;

- Determine, together with the program administrator, the program administrator's compensation; and

- Retain advisers, consultants, or other firms as needed to carry out his duties.

39.     The terms provide that Golub "will serve without compensation." However, Golub receives substantial income from his control of the Plans through his capital interest in Sequoia and through commissions paid to himself personally. *See infra* ¶¶ 58, 64.

40.     Sequoia, as program administrator, has broad powers to "control and manage the program and its assets" and "control and manage the operation and administration of the Program."

41.     Sequoia is specifically authorized to:

- Interpret and apply all provisions of the program and the benefits available to the Plans;

- Purchase insurance contracts to fund the selected benefits on behalf of the Plans, as directed by Golub;

- Determine contribution rates for the Plans (subject to final approval by Golub);

- Determine, in coordination with Golub, its own compensation; and

-11-                                              3:21-cv-00227-JSC

- Prepare and file reports with government agencies, and prepare disclosures to participants (to be distributed by employers).

42. Defendants exercised these duties and other discretionary duties in fact. Defendants determine the contributions necessary for each Plan, collect those contributions from participating employers and employees, and hold these funds in a common trust fund maintained by Golub. Additionally, Defendants select the insurance providers for each benefit available to the Plans and negotiate the amount that these insurance providers will be paid from trust assets for providing benefits, along with determining other program costs to be paid from the Plans' contributions. Defendants also enter into insurance contracts on behalf of the Plans to provide benefits under the Plans. In certain cases, like Anthem, the Tech Benefits Program is the contract holder, not the individual plans. During the relevant time, Defendants made direct payments from the common trust fund to medical, dental, vision, and life insurance providers and to a third-party claims administrator.

43. In respect to determining contributions, Defendants described their process to the Department of Labor in an audit concluded in 2019. Defendants stated that Sequoia arrives at its own estimate of proper contribution rates by relying on information provided by an outside consultant. Defendants further stated that Sequoia negotiates the contribution rates between the insurers and the employers.

44. Defendants' compensation for providing these services is not fixed by any provision of the program terms. Instead, Defendants have exercised discretion in setting their own compensation by negotiating commission rates with insurers—with whom Defendants are required to negotiate in the interest of the Plans' participants—and then keeping those commissions for themselves instead of returning them to the Tech Benefits trust or the Plans. These commissions are a percentage of the Plans' funds transferred to the insurers by Defendants from the common trust fund. As explained below, this arrangement creates a perverse incentive for Defendants to allow (or cause) the cost of the program's benefits to increase in order to increase the amount of compensation paid to Defendants.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

45.     In exercising these duties, Defendants act with respect to "assets of the Plans," and in transactions involving "assets of the Plans," within the meaning of ERISA 29 U.S.C. §§ 1002(21), 1104(a), and 1106(a)-(b). Contributions by employers and employees that are held in trust by Defendants are considered assets of the participating Plans under ERISA. *See Chao v. Graf*, 2002 WL 1611122, at \*8 (D. Nev. Feb. 1, 2002) ("Employee wage deductions and employer contributions to fund the benefit programs are clearly plan assets."); 29 C.F.R. § 2510.3-102(a)(1) ("[T]he assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer … as of the earliest date on which such contributions … can reasonably be segregated from the employer's general assets."); *see also Kayes v. P. Lumber Co.*, 51 F.3d 1449, 1467 (9th Cir. 1995) (applying two-part test to identify "assets of the plan": (1) whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary, and (2) whether such use is at the expense of the plan participants or beneficiaries"); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 908 (9th Cir. 2001) ("[P]lan 'assets' … should be construed broadly in order to effectuate Congress's 'overriding concern with the protection of plan participants and beneficiaries.'") (quoting 29 U.S.C. § 1106(b) and *Acosta v. Pacific Enterprises*, 950 F.2d 611, 620 (9th Cir. 2001)). The insurance contracts purchased by Defendants to provide benefits under the Plans are also assets of the participating Plans under ERISA. *See* 29 U.S.C. §§ 1102(a)(1)-(2); *Patelco*, 262 F.3d at 908-09 (insurance policy was an "asset of the plan").

## ERISA PROHIBITED TRANSACTIONS

46.     ERISA prohibits certain transactions "likely to prove inimical to the interest of participants." *See* H.R. Conf Rep. 93-1280 (Aug. 12, 1974) (statement of Hon. Al Ullman). Prohibited transactions are "per se" violations of ERISA. *Patelco*, 262 F.3d at 911 (quoting *Gilliam v. Edwards*, 492 F.Supp. 1255, 1264 (D.N.J. 1980)).

47.     Under ERISA's prohibited transaction rules:

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A)     sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan;

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

48.     The prohibited transactions rules further provide:

[A] fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).[6]

49.     Under these rules, a welfare plan fiduciary, including a MEWA fiduciary acting on behalf of participating plans, is prohibited from receiving commissions from insurance companies with whom the fiduciary places coverage. *See Patelco*, 262 F.3d at 911 ("It is undisputed that [the welfare plan fiduciary] received commissions from insurance companies with whom he placed Patelco's coverage, in violation of § 1106(b)(3)."); *Acosta v. WH Administrators, Inc.*, 449 F. Supp. 3d 506, 520 (D. Md. 2020) (fiduciary administering multiple plans under common terms

_____

[6] A § 1106(a) prohibited transaction described in Paragraph 47 may be entitled to an exception under 29 U.S.C. § 1108. *See* 29 U.S.C. § 1106(a) ("Except as provided in section 1108 of this title …"). A § 1106(b) prohibited transaction described in Paragraph 48 may not. *See Patelco*, 262 F.3d at 910 ("But 29 U.S.C. § 1106(b), which prohibits fiduciary self-dealing, makes no mention of the exceptions in § 1108. … We conclude that the [claimed 1108 exception] does not apply to fiduciary self-dealing.").

violated section 1106(b)(3)—as well as the duty of loyalty, see *infra* ¶¶ 51-52—by "accepting commissions from third parties", including from a "carrier relating to insurance policies that [the fiduciary] placed with the [participating] Plans."); *Scalia v. Kentucky Bankers Assoc., et al*., Case No. 3:20-cv-00636-CHB, Consent Order and Judgement, ¶¶ 2-3, ECF No. 7 (W.D. Ky. Oct. 13, 2020) (ordering repayment and re-evaluation of contracts after DOL alleged MEWA operator received prohibited commissions from insurers (*see* Compl., ¶¶ 7, 9, 48-64, ECF No. 1)).

50.     Prohibited transactions likewise may occur if a welfare plan fiduciary, including a MEWA fiduciary, exercises discretion over his own compensation or contracts with entities he owns on behalf of participating plans. *See Graf*, 2002 WL 1611122, at *10 (granting preliminary injunction against MEWA fiduciaries who "set their own compensation and … used their discretionary authority and control to cause the [participating plans] … to contract with … entities owned and controlled by [the MEWA fiduciaries].").

## ERISA FIDUCIARY DUTIES

51.     In addition to the foregoing prohibited transaction rules, ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries. 29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

52.     These ERISA fiduciary duties are "the highest known to the law", see *Howard v. Shay*, 100 F.3d 1481, 1488 (9th Circ. 1996), and apply to MEWA fiduciaries who exercise discretion or control over assets and benefits on behalf of participating plans. *See* DOL MEWA Guide, at 15; *see also Graf*, 2002 WL 1611122, at *10 (finding that MEWA fiduciary likely violated

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

section 1104(a)(1) duties of prudence and loyalty in course of self-dealing and through payment of excessive fees).

### HISTORY OF MEWA NON-COMPLIANCE AND ABUSE

53.    MEWAs have a long history of non-compliance and abuse. When not properly managed, a MEWA may constitute a "for-profit entrepreneurial enterprise" that operates contrary to the employee benefit protections of ERISA. *See Graf*, 2002 WL 1611122, at *5.

54.    Congress first attempted to remedy abuse by MEWAs in 1983 by removing or limiting preemption of certain state insurance laws. *See* Pub. L. 97-473, § 302 (Jan. 14, 1983); U.S. GOV'T ACCOUNTABILITY OFFICE, *Employee Benefits: States Need Labor's Help Regulating Multiple Employer Welfare Arrangements*, at 2 (1992) ("GAO MEWA Report").[7] A MEWA may be considered "an employee welfare benefit plan" in its own right (a "plan MEWA") or a collection of multiple such plans (a "non-plan MEWA"), depending on who sponsors the MEWA.[8] Preemption from state insurance laws available to *plan* MEWAs in ERISA's original text was appealing to unscrupulous operators and led to false claims of plan status that frustrated state insurance commissioners. *See* GAO MEWA Report at 2; DOL MEWA Guide at 3. Congress attempted to remove the incentive to falsely claim plan status, and help states co-regulate MEWAs, by eliminating or limiting preemption for plan MEWAs. *Id.*; 29 U.S.C. § 1144(b)(6). This legislation created a federal definition of MEWA:

> The term "multiple employer welfare arrangement" means an employee welfare benefit plan, or any other arrangement (other than an employee welfare benefit plan), which is established or maintained for the purpose of offering or providing any benefit described in paragraph (1) to the employees of two or more employers (including one or more self-employed individuals), or to their beneficiaries, except

---

[7] *Available at* https://www.gao.gov/assets/hrd-92-40.pdf.

[8] *See* DOL MEWA Guide, at 5-10, 15, 24. A plan MEWA is a MEWA established by a qualified association of employers or an employee organization (for example, a labor union). *Id.* at 5-10. A non-plan MEWA is a MEWA established by anyone else. *Id.* at 15, 24. The distinction determines whether a MEWA is subject to all ERISA requirements that apply to "employee benefit plans". *Id.* at 11. A MEWA's plan or non-plan status does <u>not</u> determine whether its operator is subject to ERISA's fiduciary duties or prohibited transaction rules. An operator of a non-plan MEWA is considered a fiduciary of participating plans, and subject to fiduciary liability under ERISA, to the extent it exercises discretion or control over the assets and administration of those plans. *Id.* at 5; *see also* GAO MEWA Report at n. 2; DOL MEWA Guide at 15; *WH Administrators*, 449 F. Supp. 3d at 516-17; *Graf*, 2002 WL 1611122, at *5-*6, *8-*9. Such is the case here. *See supra* ¶¶ 35-45.

that such term does not include any such plan or other arrangement which is established or maintained--

(i) under or pursuant to one or more agreements which the Secretary finds to be collective bargaining agreements,

(ii) by a rural electric cooperative, or

(iii) by a rural telephone cooperative association.

29 U.S.C. § 1002(40)(A).[9]

55.    The 1983 non-preemption measure did not significantly reduce MEWA abuse. The MEWA format continued to attract unscrupulous operators. *See* GAO MEWA Report at 2-3. States often could not identify corrupt MEWAs before participants were harmed. *See id.* In response, Congress enacted further remedial legislation that specifically authorized the Secretary of Labor to, among other things, require non-plan MEWAs that offer medical care to file periodic public reports.[10] *See* Pub. L. 104-191, tit. I, § 101(e)(1) (Aug. 21, 1996). However, the Secretary determined that the MEWA problem required a more comprehensive reporting regime and used other authority granted by Congress to expand the reporting requirement to all MEWAs, and even those claiming exception from MEWA treatment. *See* 65 Fed. Reg. 7152, at 7153 (Feb. 11, 2000) (interim rule); 68 Fed. Reg. 17494 (Apr. 9, 2003) (final rule).

56.    Despite these reporting requirements, MEWA violations continued to be common. *See* 76 Fed. Reg. at 76223 ("Despite the reporting requirements, many … MEWA abuses ... persist[.]"). In response, Congress enacted new criminal penalties for certain misrepresentations made by MEWA operators and enhanced the reporting regime by requiring certain MEWA operators to register with the Secretary before doing business in any state (among other things). *See* Pub. L. 111-148, tit. 6, §§ 6604-06 (Mar. 23, 2010). The Secretary of Labor again used the new legislation and other powers to broaden the registration requirement to all MEWAs and operators

_____

[9] Multiple employers that are part of the same control group are treated as a single employer and not regulated as MEWA operators. 29 U.S.C. § 1002(40)(B)(i)-(iii). The exception for rural electric and telephone cooperatives is based on the "vital" service provided by these plan operators to cooperative employees nationwide and the absence of need for additional regulation. *See* H.R. Rep. 102-50 (July 15, 1991).

[10] *See* 76 Fed. Reg. 76222, at 76222-23 (Dec. 6, 2011) ("The original MEWA reporting requirement … was enacted in response to the [GAO MEWA Report].")

claiming exception, and to require additional disclosures. *See* 76 Fed. Reg. at 76223-27 (proposed rule); *see also* 78 Fed. Reg. 13781 (Mar. 1, 2013) (final rule).

57.     Notwithstanding the persistent efforts by Congress and the Secretary of Labor to force MEWAs to comply with ERISA and other laws, MEWAs continue to disregard important protections for participants—including ERISA's prohibition against fiduciary commissions. *See Scalia v. Medova Healthcare Financial Group LLC, et al.*, Case No. 2:20-cv-2624-TC-ADM (D. Kans.), Compl. ¶¶ 96 & 98(d)-(g), ECF. No. 1 (Dec. 9, 2020) (alleging that MEWA fiduciaries violated ERISA by, among other things, receiving commissions from program insurer);[11] *Kentucky Bankers Assoc.*, Consent Ord. & Judg., ¶¶ 2-3, ECF No. 7 (ordering restitution after DOL alleged that MEWA fiduciaries violated ERISA by, among other things, receiving commissions from insurers); *see also WH Administrators, Inc.*, 449 F. Supp. 3d at 510-12 & 520.[12]

## DEFENDANTS' VIOLATIONS OF ERISA

### Defendants Received Improper Commissions

58.     As noted above, Defendants act as fiduciaries of the Plans with authority to arrange benefits, negotiate the cost to the Plans, and determine Defendants' own compensation, among other things. *See supra* ¶¶ 35-45. Defendants may not use their authority to benefit themselves, see *supra* ¶¶ 46-52, yet Defendants accept kickbacks from the insurance providers with whom they place the Plans' coverage. Defendants have received, and continue to rake in, substantial commissions from the Plans' insurers (Golub in his own name and through his capital interest in Sequoia)—more than $100 million in aggregate in the last six years.[13]

59.     What is more, Defendants receive commissions as a percentage of the cost to the Plans, providing a perverse incentive for Defendants to cause the Plans to pay more to increase

---

[11] The Medova Healthcare MEWA case is ongoing and there has been no finding or admission of liability.

[12] The court found that WH Administrators was a fiduciary of more than 100 unrelated plans that paid contributions to common accounts controlled by WH Administrators and received benefits provided or arranged by WH Administrators under standard documents—although the DOL did not specifically allege that WH Administrators was a "MEWA" operator. *See* 449 F. Supp. 3d at 510-12 & 516-17. In any case, WH Administrators' receipt of commissions as a fiduciary to the plans violated ERISA. *Id.* at 520.

[13] ERISA contains a six-year statute of limitations. *See* 29 U.S.C. 1113(1).

their own compensation. Accepting these commission payments from the Plans' counterparties violates ERISA's prohibited transaction rules and fiduciary duties. *See supra* ¶¶ 46-52.[14] ERISA requires Defendants pay these commissions to the Plans.

60.    Defendants' largest commission is paid by the Tech Benefits MEWA's primary medical benefit provider, Anthem. This commission is 6% of the total cost to the Plans (including Anthem's fees). Defendants received the following commissions from Anthem since 2015:[15]

|  | Anthem Commission Amount |
|---|---|
| 2019 | $21,609,135 |
| 2018 | $17,703,435 |
| 2017 | $15,548,423 |
| 2016 | $12,426,675 |
| 2015 | $8,326,934 |

61.    The structure of the Anthem commission (a percentage of the cost to the Plans) and the drastically escalating amounts show that Defendants are using their discretion to benefit themselves in violation of ERISA's prohibited transaction rules and their fiduciary duties. Based on these figures, it is also reasonable to infer that Defendants are not simply tracking direct and necessary expenses and instead are receiving a substantial windfall. Defendants' commission percentage has remained fixed even as the cost of Anthem's coverage more than doubled between 2015 and 2019. An expense reimbursement program would reflect certain efficiencies as Sequoia enrolls more Plans and participants in the program, resulting in a reduction in Sequoia's direct and necessary expenses as a percentage of the cost of coverage. Yet Sequoia has continued to receive the same rate, resulting in a commission that has more the doubled without regard to Defendants' actual cost of administering the program.

---

[14] There are appropriate means for a fiduciary, including a MEWA fiduciary, to be paid—and even to profit—for providing a fiduciary service. A party independent of the fiduciary receiving the compensation should have authority to determine the compensation that the plans will pay, and the compensation must not be influenced by matters that are within the receiving fiduciary's control or structured in a way that violates 29 U.S.C. § 1106(b). This is not what Defendants did.

[15] Sequoia's 2020 commission has not been publicly reported to date.

3:21-cv-00227-JSC

62.     The Anthem commission is also excessive in light of purported economies of scale touted by Defendants. Defendants promote Tech Benefits as a "pooling model" that supposedly offers "health insurance at large group rates." Defendants' commission agreement with Anthem, however, calls for a small group commission rate. Between 2015 and 2019, Anthem in California (Blue Cross of California) paid between 2.68% and 1.46% of all premiums earned in commissions in the large group market, compared to 7.37% to 5.60% in the small group market. The percentage of premiums paid out as commissions in both markets also decreased each year. Whatever economies of scale might exist with regard to the Tech Benefits "pooling model," Defendants did not apply those economies of scale in negotiating its 6% commission rate with Anthem. In 2017-2019, Defendants' 6% rate was higher than even the average small market commission.

63.     Defendants have received nearly $100 million in commissions from Anthem *alone* since 2015 (including an estimated 2020 commission that is similar to 2019). Yet these are not the only commissions Defendants receive as fiduciaries of the Plans. Sequoia and Golub also receive commissions in connection with other benefits obtained on behalf of the Plans.

64.     Plan records show that Defendants were paid substantial additional sums from insurance providers as commissions and fees for the sale of other medical, dental, vision, and life insurance coverage that Defendants arranged for the Plans. Defendants received contributions for these benefits into the Tech Benefits common trust account and then directed them to insurance providers on behalf of the Plans, who in turn paid Defendants a commission. Certain of these commissions were paid to Sequoia, and others were paid in Golub's name personally. The estimated amount of such additional commissions since 2015 is up to $6 million per year or more.[16] ERISA required Defendants to pay these commissions to the Plans.

65.     Defendants' scheme to obtain discretion over their own compensation, arrange coverage with certain providers on behalf of the Plans, and then receive a percentage of the cost of coverage from those providers as a kickback has proven to be wildly lucrative for Defendants. However, it is contrary to the interests of the participants that Defendants are bound to represent.

---

[16] These commissions are identified in filings by the individual Plans and are subject to reporting deficiencies and non-reporting by the Plans.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

**Defendants Authorized Excessive Administrative Fees**

66.     Defendants also authorized excessive administrative fees to be paid to insurance providers. As described above, Defendants determine the contribution rates for each Plan. Contribution rates include administrative fees kept by the insurance provider and not used to pay for medical or other care. Defendants are required to negotiate these rates on behalf of the Plans, yet Defendants have a selfish interest in causing the Plans to pay higher rates because some of the amounts paid to insurance providers are kicked back to Defendants (*see supra* ¶¶ 58-61). The increase in rates between 2015 and 2019 shows that Defendants have succumbed to their conflict of interest and failed to advocate prudently and loyally for the Plans.

67.     For example, Anthem, as the Plans' primary medical benefit provider, receives fees calculated based on the number of covered participants. Anthem's fee per covered participant appears to have increased significantly on both an aggregate basis *and per-participant basis* between 2015 and 2019:[17]

|  | Anthem Fee | Anthem Fee Per Covered Participant[18] |
|---|---|---|
| 2019 | $25,460,941 | $859 |
| 2018 | $18,777,971 | $716 |
| 2017 | $17,256,867 | $722 |
| 2016 | $13,653,897 | $591 |
| 2015 | $9,702,622 | $544 |

68.     As Defendants have enrolled more and more Plans and participants in coverage through Anthem, certain efficiencies and negotiating leverage in favor of the Plans are expected. However, the cost to the Plans has followed the opposite trajectory. As Defendants have placed more business with Anthem, its rates have gone up. Defendants are obligated to work diligently to limit these fees, but Defendants are conflicted because they get paid more if Anthem gets paid

---

[17] The 2020 Anthem fees have not been publicly reported.
[18] Based on the average of the number of participants covered at the end of the year and the end of the prior year.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

more. Defendants have carelessly and selfishly failed to limit these fees, to the detriment of the Plans' participants.

## PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' VIOLATIONS

69. Plaintiffs did not have knowledge of all material facts (including, among other things, the scope of Defendants' responsibilities, Defendants' compensation structure, Defendants' compensation amounts, or administrative fees paid to insurance providers) necessary to understand that Defendants engaged in prohibited transactions and breached their fiduciary duties in violation of ERISA until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to Tech Benefits and the Plans because this information is solely within the possession of Defendants prior to discovery. For purposes of this Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

70. Plaintiffs bring this action individually and on behalf of the RingCentral Plan, and as a class action on behalf of participants in other Plans, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

71. Plaintiffs assert their claims in Counts I - II on behalf of the following class: [19]

> All participants in employee welfare benefit plans that obtained insurance
> through the Tech Benefits MEWA since January 11, 2015, that paid a share
> of the contributions toward that insurance.

72. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plans have had around 30,000 participants during the applicable period. Defendants have stated that a "common strateg[y]" was to require employees to contribute a share.

73. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plans, and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members with regard to the Plans. Defendants managed the Plans in

---

[19] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

the same manner through the Tech Benefits MEWA and therefore Defendants' improper actions affected all Plan participants similarly.

74. <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class. Their interests are aligned with the Class that they seek to represent and they have retained counsel experienced in complex class action litigation, including ERISA class actions. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

75. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a. Whether Defendants are fiduciaries of the Plans;

    b. Whether Defendants engaged in prohibited transactions by engaging in the conduct described herein;

    c. Whether Defendants breached ERISA's fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

    d. The proper measure of monetary relief; and

    e. The proper form of equitable relief.

76. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

77. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual participants, as a practical matter, would be dispositive of the interests of other participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other participants in the Plans.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

78.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Amended Complaint has applied to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Prohibited Transactions
### 29  U.S.C. § 1106(a)-(b)

79.     As alleged in this Amended Complaint, Defendants are fiduciaries and parties-in-interest to the Plans.

80.     Acting in fiduciary capacities, Defendants arranged for the Plans to make contributions to a trust fund; determined the amount of those contributions based on certain costs within Defendants' authority to negotiate; directed periodic payments from the trust fund to insurance providers to cover those costs; received a percentage of such payments from the insurance providers on a periodic basis as commissions; and failed to return the commission payments to the Plans. In doing so, Defendants also were empowered by discretion over their own compensation. Defendants acted for their own benefit, and in fact received funds for their own accounts, and had interests that better aligned, in theory and in the result, with the Plans' counterparties.

81.     These transactions were prohibited by ERISA. Defendants dealt with the Plans' assets in their own interests and for their own accounts, in violation of 29 U.S.C. § 1106(b)(1),

acted in transactions involving the Plans on behalf of parties whose interests were adverse to those of the Plans, in violation of 29 U.S.C. § 1106(b)(2), and received consideration for their personal accounts from parties dealing with the Plans in connection with transactions involving assets of the Plans, in violation of 29 U.S.C. § 1106(b)(3). Defendants also violated 29 U.S.C. § 1106(a)(1)(D) by knowingly transferring Plan assets to themselves indirectly as parties-in-interest to the Plans and by knowingly using plans assets for their own benefit as parties-in-interest.

82.    As a direct and proximate result of these prohibited transactions, the Plans indirectly paid Defendants more than $100 million. The Plans and participants suffered the loss of these monies and opportunity costs associated with the payment of these monies to Defendants, rather than to the Plans or participants in the Plans. Defendants are liable to make good to the Plans all losses suffered as a result of Defendants' prohibited transactions, make restitution of the prohibited commission and fee payments, and to disgorge all profits associated with their unlawful conduct. Plaintiffs and Class members are further entitled to a constructive trust over Defendants' profits for the benefit of participants and an order requiring distribution of those profits to participants in proportion to their contributions. In addition, Class members are entitled to further equitable relief as the Court may allow.

## COUNT II
### Breach of Fiduciary Duties
### 29 U.S.C. § 1104(a)(1)(A)-(B)

83.    As alleged in this Amended Complaint, Defendants are fiduciaries of the Plans and are subject to ERISA's fiduciary duties.

84.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants in their administration of Plans and in their determination of expenses to be borne by the Plans (among other things).

85.    Defendants have breached these duties, and continue to breach these duties, by engaging in the conduct described herein. Defendants have acted in their own interest and without due care by accepting unlawful commissions and fees, and by failing to control other expenses that increase Defendants' compensation but have an adverse effect on the Plans.

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

86.   As a consequence of Defendants' breaches of fiduciary duty, the Plans and participants suffered millions of dollars in losses due to improper and excessive payments to Defendants and insurance providers.  Defendants are liable to make good to the Plans all losses suffered as a result of Defendants' fiduciary breaches, make restitution of improper commissions and other charges, and disgorge all profits resulting from Defendants' unlawful conduct, in addition to further equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the RingCentral Plan, and as representatives of the Class of persons defined herein and on behalf of their Plans, pray for relief as follows:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A declaration that Defendants have engaged in prohibited transactions and breached their fiduciary duties in the manner described in the Amended Complaint;

D.   An order compelling Defendants to personally make good to the Plans all losses that the Plans incurred as a result of the prohibited transactions and breaches of fiduciary duties described above;

E.   An order depriving Defendants of any profits of their violations of ERISA, including an order under the label of restitution, disgorgement, unjust enrichment, surcharge, constructive trust, or any other equitable remedy intended to deprive a trustee or fiduciary of improper profits;

F.   Such other orders consistent with principles of equity requiring that recovered profits and losses be used or distributed for the benefit of participants in proportion to their contributions;

G.   An award of pre-judgment interest;

H.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.   An award of such other and further relief as the Court deems equitable and just.

Dated: July 1, 2021                    **NICHOLS KASTER, LLP**


                                       By:     /s/ Brock J. Specht
                                               Brock J. Specht

                                       Attorney for Plaintiffs and the proposed Class

AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF