JEFFREY S. BOSLEY (CA State Bar No. 167629)
jeffbosley@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111-6533
Telephone:   (415) 276-6500
Facsimile:    (415) 276-6599

DAVID N. LEVINE (Admitted *Pro Hac Vice*)
dlevine@groom.com
MARK C. NIELSEN (Admitted *Pro Hac Vice*)
mnielsen@groom.com
SARAH M. ADAMS (Admitted *Pro Hac Vice*)
sadams@groom.com
KARA P. WHEATLEY (Admitted *Pro Hac Vice*)
kwheatley@groom.com
PAUL J. RINEFIERD (Admitted *Pro Hac Vice*)
prinefierd@groom.com
KALENA R. KETTERING (Admitted *Pro Hac Vice*)
kkettering@groom.com
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue, NW, Suite 1200
Washington, D.C. 20006
Telephone:   (202) 857-0620
Facsimile:    (202) 659-4503

Attorneys for Defendants
SEQUOIA BENEFITS AND INSURANCE
SERVICES, LLC and GREGORY S. GOLUB

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| RACHAEL WRIGHT WINSOR and NICOLE BEICHLE, individually and on behalf of the RingCentral, Inc. Welfare Benefits Plan, and on behalf of similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>SEQUOIA BENEFITS AND INSURANCE SERVICES, LLC and GREGORY S. GOLUB,<br><br>Defendants. | Case No. 3:21-CV-00227-JSC<br><br>Assigned to Hon. Jacqueline Scott Corley<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Date:        Thursday, October 7, 2021<br>Time:        9:00 AM<br>Courtroom:   E, 15th Floor<br>               San Francisco Courthouse<br><br>FAC Filed:   July 1, 2021<br>Trial Date:   Not Set |

Case No. 3:21-CV-00227-JSC

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## NOTICE OF MOTION AND MOTION

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Thursday, October 7, 2021, at 9:00 AM, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Jacqueline Scott Corley, United States Magistrate Judge, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102-3489, in Courtroom E on the 15th Floor, or by remote conferencing as directed by the Court, Defendants Sequoia Benefits and Insurance Services, LLC and Gregory S. Golub ("Defendants") will and hereby do move the Court pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for an Order dismissing the Amended Complaint brought by Rachael Wright Winsor and Nicole Beichle (collectively, "Plaintiffs"), with prejudice.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Defendants respectfully move for dismissal of Plaintiffs' Amended Complaint, in its entirety and with prejudice, pursuant to Rule 12(b)(1) for lack of Article III standing, or, alternatively, pursuant to Rule 12(b)(6), given that, even accepting Plaintiffs' well-pled factual allegations as true, Defendants did not act as fiduciaries with respect to their own compensation.

Case No. 3:21-CV-00227-JSC

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ii

I.     INTRODUCTION ............................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................................. 4

    A.   The Program Is a Pre-Packaged Product that Sequoia Designs and Offers to Employers ...... 4

    B.   Roles and Responsibilities of Defendants, Employers, and Employees in the Program......... 5

        1.   Sequoia Serves as Broker to Employers and Administrator for the Program.................. 6

        2.   The Trust Fund Receives and Disburses Premiums to Insurers...................................... 7

        3.   Participating Employers Serve as Plan Fiduciaries, Decide Which Benefits to Offer and the Amount of Employee Contributions ....................................................... 7

        4.   Employees Choose Their Own Coverage From the Menu of Options Selected by Their Employer.................................................................................................. 8

    C.   RingCentral's Participation in the Program .......................................................... 8

III.   STANDARD OF REVIEW.................................................................................... 10

IV.    ARGUMENT.................................................................................................... 11

    A.   Plaintiffs Have Still Not Established Article III Standing ...................................... 11

        1.   Plaintiffs Have Not Alleged a Concrete Injury ............................................ 12

        2.   Plaintiffs Fail to Plausibly Allege Traceability .............................................. 16

        3.   Plaintiffs' Purported Injury is Not Redressable.............................................. 19

    B.   Defendants Were Not Fiduciaries as Alleged in the Amended Complaint ......................... 21

        1.   Defendants Were Not Fiduciaries with Respect to the RingCentral Plan's Purchase of Insurance though the Tech Benefits Program ........................................... 22

        2.   Sequoia Was Not a Fiduciary With Respect to Disclosed Commissions....................... 27

IV.    CONCLUSION.................................................................................................. 30

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Am. Freedom L. Ctr. v. Obama*,
   106 F. Supp. 3d 104 (D.D.C. 2015), *aff'd*, 821 F.3d 44 (D.C. Cir. 2016).................................... 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................................... 11

*Butler v. Obama*,
   814 F. Supp. 2d 230 (E.D.N.Y. 2011)........................................................................... 17

*California v. Texas*,
   141 S. Ct. 2104 (2021) ............................................................................................. 11, 16

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
   433 F.3d 181 (2d Cir. 2005)..................................................................................... 15, 16

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
   474 F.3d 463 (7th Cir. 2007)............................................................................ 24, 27, 28

*Daniels v. Nat'l Emp. Benefit Servs., Inc.*,
   858 F. Supp. 684 (N.D. Ohio 1994) .............................................................................. 21

*Depot, Inc. v. Caring for Montanans*,
   915 F.3d 643 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 223 (2019)............................. 11, 20, 21, 26

*Doe 1 v. Express Scripts, Inc.*,
   837 F. App'x 44 (2d Cir. 2020)................................................................................. 24, 28

*Ed Miniat, Inc. v. Glob. Life Ins. Grp., Inc.*,
   805 F.2d 732 (7th Cir. 1986)........................................................................................ 28

*F.H. Krear & Co. v. Nineteen Named Trs.*,
   810 F.2d 1250 (2d Cir. 1987)........................................................................................ 27

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
   465 F.3d 1123 (9th Cir. 2006)....................................................................................... 19

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ...................................................................................................... 20

*Hecker v. Deere Co.*,
   556 F.3d 575 (7th Cir. 2009)................................................................................... 25, 29

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*In re Express Scripts/Anthem ERISA Litig.*,
   285 F. Supp. 3d 655 (S.D.N.Y. 2018), *aff'd sub nom. Doe 1 v. Express Scripts, Inc.*,
   837 F. App'x 44 (2d Cir. 2020) ................................................................................................ 28

*In re Express Scripts, Inc. PBM Litig.*,
   No. 4:05-MD-01672, 2008 WL 2952787 (E.D. Mo. July 30, 2008) ........................................ 28

*In re Fidelity ERISA Fee Litigation*,
   990 F.3d 50 (1st Cir. 2021) .......................................................................................... 23, 24, 29

*Leimkuehler v. Am. United Life Ins. Co.*,
   713 F.3d 905 (7th Cir. 2013) ................................................................................................... 23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................................. 19

*Mahoney v. J.J. Weiser & Co.*,
   564 F. Supp. 2d 248 (S.D.N.Y. 2008), *aff'd*, 339 F. App'x 46 (2d Cir. 2009)................. 22, 26, 29

*Manzarek v. St. Paul Fire & Marine Insurance Co.*,
   519 F.3d 1025 (9th Cir. 2008) ................................................................................................. 11

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
   811 F.3d 998 (8th Cir. 2016) ................................................................................................... 26

*Moeckel v. Caremark, Inc.*,
   622 F. Supp. 2d 663 (M.D. Tenn. 2007) ............................................................................. 24, 28

*Mulder v. PCS Health Sys., Inc.*,
   432 F. Supp. 2d 450 (D.N.J. 2006) .......................................................................................... 29

*Nat'l Fam. Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020) ................................................................................................... 10

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ................................................................................................................. 21

*Pomponio v. Brand Motors, LLC*,
   No. 19-CV-04750, 2020 WL 922450 (N.D. Cal. Feb. 26, 2020)................................................ 10

*Ronches v. Dickerson Emp. Benefits, Inc.*,
   No. CV0904279, 2009 WL 10669571 (C.D. Cal. Oct. 30, 2009)................................................ 25

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004).............................................................................................. 10, 11

*Santomenno v. John Hancock Life Ins. Co. (USA)*,
   768 F.3d 285 (3d Cir. 2014)...................................................................................................... 23

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*Santomenno v. Transamerica Life Ins. Co.*,
    883 F.3d 833 (9th Cir. 2018) .......................................................................... 23, 26, 27

*Schulist v. Blue Cross of Iowa*,
    717 F.2d 1127 (7th Cir. 1983) ............................................................................... 27

*Seaway Food Town, Inc. v. Med. Mut. of Oh.*,
    347 F.3d 610 (6th Cir. 2003) .................................................................................. 28

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................................... 10

*Thole v. U.S. Bank N.A.*,
    140 S. Ct. 1615 (2020) ........................................................................................... 16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ................................................................................ 11, 12, 16

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) .......................................................................... 25, 30

Statutes

29 U.S.C. § 1001 ............................................................................................................ 1
29 U.S.C. § 1002(21)(A) ............................................................................................... 21
29 U.S.C. § 1102(a)(2) .................................................................................................. 21
29 U.S.C. § 1104(a)(1) .................................................................................................. 21
29 U.S.C. § 1106 ........................................................................................................... 21
29 U.S.C. § 1109 ........................................................................................................... 20
29 U.S.C. § 1132(a) ................................................................................................. 19, 20
29 U.S.C. § 1185d(a)(1) ................................................................................................ 17

Rules

Rule 12(b)(1) ................................................................................................................... 1
Rule 12(b)(6) ................................................................................................................... 1

Case No. 3:21-CV-00227-JSC

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# I.   __INTRODUCTION__

Plaintiffs Rachael Winsor and Nicole Beichle ("Plaintiffs") have attempted to re-plead their putative class action complaint against Defendants Sequoia Benefits and Insurance Services, LLC ("Sequoia") and Gregory S. Golub ("Golub") (collectively, "Defendants"), and again allege that Defendants' receipt of commissions from insurance companies that offer policies through the "Tech Benefits Program" (also referred to herein as the "Program") violates the prohibited transaction and fiduciary rules set forth in the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et. seq.* ("ERISA").  *See* Am. Class Action Compl. (ECF 55) ("Amended Complaint" or "Am. Compl.").  The Court dismissed Plaintiffs' first Complaint for failing to establish "even the first element of Article III standing"—an injury in fact—let alone the other elements of standing.  Order re: Mot. to Dismiss (ECF 54) ("MTD Opinion" or "MTD Op."), at 4.  The Court instructed that any amended pleading must allege plausibly not only Article III standing, but also that Defendants acted as fiduciaries.  *See id.*  The Amended Complaint, however, fails in both regards.  Accordingly, it should be dismissed—this time with prejudice.

The Tech Benefits Program is an arrangement through which participating employers join together to secure insurance coverage for their individually-maintained health and welfare plans.  The Program simply makes available, to any eligible employer, a product:  health, dental, vision, disability, and/or life insurance coverages—offered by specific insurers at underwritten premium costs—that employers may choose to offer to their respective employees.

The Program offers employers a suite of administrative services, as well as access to pre-packaged insurance options.  Participating employers agree to the cost of coverage for the insurance options (if any) they select from the Program, and determine how much (if anything) that their employees must contribute toward the cost of such coverage (subject to the caveat that each employer must cover a ***minimum*** amount of the cost of coverage).  Employers remit premiums to the Program's bank account—which is held in trust—and the Trustee then, in turn, remits such amounts to the respective insurers that employers select.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Despite the Amended Complaint's repeated allegations that there is a "long history of non-compliance and abuse" by multiple employer welfare arrangements, *see, e.g.*, Am. Compl. ¶ 53, Plaintiffs do ***not*** allege that any of their insurance claims were denied, that the Program is at risk of insolvency, or that the coverage made available through the Program is illusory or fraudulent. To the contrary, Plaintiffs ***admit***, as they did in their initial pleading, that they received health, dental, vision, disability, and/or life insurance benefits under the plan sponsored by their employer, RingCentral, Inc. ("RingCentral"). *See id.* ¶¶ 10, 16. And, if this case proceeds forward (which it should not), the evidence will show that one of the named Plaintiffs ***praised*** Sequoia for the services it offered. Plaintiffs' ***sole*** allegation of "harm" is that they paid too much out-of-pocket for the insurance coverage they elected under RingCentral's plan. But this claim suffers from the same defects that the Court identified when it dismissed the first Complaint for lack of Article III standing, which Plaintiffs fail to address in the Amended Complaint:

***First***, Plaintiffs do not plausibly allege that their employee contributions would have been lower ***but for*** the commissions at issue (which allegedly caused higher premiums), which was a key point that the Court addressed at length in its MTD Opinion, as well as at oral argument. *See* Tr. of Mot. Hr'g, May 28, 2021 (ECF 59) ("Hr'g Tr.") at 3:3-13 ("[M]y question is injury . . . . [W]ithout any allegations as to how the employees' contributions are calculated, I don't know how there's a plausible inference that a lower-cost insurance plan would mean lower contributions from employees."). In their Amended Complaint, Plaintiffs still do not explain how RingCentral set its employee contribution rate, and they do not explain how (or why, or by how much) their ***employee*** contributions would have been lower if RingCentral had offered coverage with lower overall premiums. Indeed, Paragraph 15 of the Amended Complaint reveals that RingCentral had ***no*** fixed formula to determine how much employees are (or were) required to contribute to insurance coverage. Put simply, despite the Court's clear instruction, Plaintiffs have not plausibly alleged any ***facts*** that the employee contribution rates charged by RingCentral were higher because of the commissions at issue or the premiums that third-party insurers charged RingCentral.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*Second*, even if Plaintiffs alleged a cognizable "injury"—which they do not—they admit that it was **RingCentral**, **not** Defendants, who determined how much (**if anything**) its employees would contribute toward the cost of insurance coverage. This traceability/causation issue is a point that the Court also addressed during oral argument two months ago, pointing out Plaintiffs' pleading deficiencies as to this element. *Id.* at 14:24-16:10 (noting that there were no facts alleged as to how Defendants were involved in setting RingCentral's employee contribution rates). The Amended Complaint does not address the Court's instruction and does not allege *any* new facts that plausibly suggest Defendants played any role in setting RingCentral's employee contribution rate. Instead, Plaintiffs admit that **RingCentral** sets employee contribution rates, and that it does so based on "various factors," **none** of which involve Defendants. *See* Am. Compl. ¶ 15.

*Third*, Plaintiffs fail to satisfy the redressability element of Article III standing, given that—if liability could be established—any amount recovered would not inure to Plaintiffs, but rather would be remitted to the Trust for employers to decide independently how to utilize such recovery. Again, this is an issue the Court addressed at oral argument. *See* Hr'g Tr. at 5:18-7:25 (the Court advising Plaintiffs that they were "relying on sort of the remedy to prove your injury"); *id.* at 6:17-18. Plaintiffs, however, double down in their Amended Complaint, alleging that because equitable *remedies* may be available (which they are not), they have somehow satisfied Article III's redressability standard. But a remedy without injury does not confer standing.

Even if Plaintiffs had Article III standing, their claims still fail as a matter of law for another reason: Defendants did not act as fiduciaries with respect to the activities underlying Plaintiffs' alleged ERISA violations. Defendants simply designed a product—the Tech Benefits Program—that it offered to employers, including RingCentral, for consideration. The terms of the Program's governing documents make clear that each employer *independently* decided whether to participate in the Program, and, if so, which (if any) of the insurance coverages offered under the Program—and the corresponding premium cost—that it would elect. Regarding Plaintiffs specifically, there is no dispute that **RingCentral** alone:

- Determined to initially purchase insurance through the Program (and at what cost);

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

- Decided, at renewal, to continue to purchase insurance through the Program (and which Program options to offer its employees) or to look elsewhere for coverage;

- Established how much (if anything) its employees would contribute toward the cost of the insurance that each employee elected; and

- Agreed, in writing, that Sequoia would receive commissions from third-party insurance carriers (and Plaintiffs admit commissions were *not* paid by RingCentral or its plan).

The Court's MTD Opinion advised Plaintiffs that they were "now on notice" of infirmities in their fiduciary argument and instructed Plaintiffs to "attempt to cure them in an amended complaint if they [could] do so in good faith." MTD Op. at 4. Plaintiffs have failed to do so. Accordingly, the Amended Complaint should be dismissed with prejudice.[1]

## II.    FACTUAL BACKGROUND

### A.    The Program Is a Pre-Packaged Product that Sequoia Designs and Offers to Employers

Sequoia is an insurance broker. The Program, which is one of the insurance options Sequoia presents to employers, is a pre-packaged product. The Program offers employers in the high-tech industry, including start-ups and emerging companies, a menu of health, dental, vision, disability, and/or life insurance products that employers may elect to offer their employees. The Program also includes a number of administrative features that Sequoia provides to employers—such as consolidated billings of insurance premiums, billing reconciliation and discrepancy resolution services, COBRA services, benefit enrollment systems, and data management as it relates to insurance coverage. *See*

---

[1] Defendants are contemporaneously filing a Request for Judicial Notice with respect to the following documents, which are incorporated by reference into Plaintiffs' Amended Complaint or otherwise qualify for judicial notice: Ex. A: Adoption Agreement signed by John Marlow on behalf of RingCentral, Inc. ("RingCentral") on December 23, 2013; Ex. B: Agreement to Provide Employee Benefit Services between Sequoia Benefits, LLC and RingCentral, made and entered into as of May 2, 2013; Ex. C: RingCentral Benefits Guide for 2016 for the State of California; Ex. D: RingCentral Benefits Guide for 2017 for the State of California; Ex. E: RingCentral Benefits Guide for 2018 for the State of California; Ex. F: RingCentral Benefits Guide for 2019; Ex. G: Tech Benefits Program Form 5500 Annual Report for the plan year beginning January 1, 2019; Ex. H: RingCentral, Inc. Welfare Benefits Plan Form 5500 Annual Report for the plan year beginning January 1, 2015; Ex. I: RingCentral, Inc. Welfare Benefits Plan Form 5500 Annual Report for the plan year beginning January 1, 2016; Ex. J: RingCentral, Inc. Welfare Benefits Plan Form 5500 Annual Report for the plan year beginning January 1, 2017; Ex. K: RingCentral, Inc. Welfare Benefits Plan Form 5500 Annual Report for the plan year beginning January 1, 2018; Ex. L: RingCentral, Inc. Welfare Benefits Plan Form 5500 Annual Report for the plan year beginning January 1, 2019.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

https://www.sequoia.com/services/sequoia-tech/. By offering employers a menu of coverage options and a comprehensive suite of administrative services, the Program allows participating employers to deliver benefit programs to their employees that are competitive to those offered by larger companies. *Id.*

In designing the product (*i.e.*, the Program), Sequoia chooses the types of insurance (such as health, dental, vision, disability, and/or life) that will be available in the Program, identifies one or more insurers willing to issue a policy or policies covering all eligible participating employers, and selects the insurers and insurance policies that will be made available through the Program at premium rates quoted by the insurer. When Sequoia conducts these activities, it is ***not*** acting on behalf of any employer. Contrary to Plaintiffs' suggestion, Sequoia does not negotiate individualized coverages with the carriers that will be offered to each employer. Nor does it negotiate the premium rates charged (and, in turn, the commission rates it receives) with regard to any specific employer—the premium rates are specified in the policy. This product—a selection of insurance coverages at quoted premium rates (with associated commissions)—is offered to employers who decide whether or not they would like to purchase insurance coverage through the Program or other sources.

**B.       Roles and Responsibilities of Defendants, Employers, and Employees in the Program**

The Tech Benefits Program is governed by the "Tech Benefits Program Agreement" ("Program Agreement"). The Program Agreement, and other foundational documents, set forth separate and distinct roles for the four entities at issue in the Amended Complaint:

- Sequoia serves as the "Administrator" of the Program, *see* Am. Compl. Ex. 1, Program Agreement, § 3.01; Am. Compl. ¶ 28, as well as the insurance broker and provider of certain administrative services, *see* Ex. B, RingCentral Services Agreement, §§ 1, 3, 5;

- The Program's "Trustee" is responsible for handling monies paid into the Program's bank account from which certain premiums[2] and administrative fees are paid to permissible third

---

[2] Employers approve and remit the cost of coverages they elect for their plans. For example, under Anthem's fully-insured arrangement offered through the Program, the cost of that coverage—the total contributions required to be paid by the employer for coverage—includes amounts paid to the insurer (i) as premium and (ii) to fund claims under the Program. When referring to the employer's payment of "premiums," we are referring to the employers' total contribution amount that is paid to the insurer. *See*

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

parties (such as insurers) as directed by participating employers, *see* Ex. 1, Program Agreement, §§ 4.01, 4.02;

- Employers sponsor their own plans, *see* Am. Compl. ¶¶ 26, 33, and, acting as plan fiduciaries, choose the insurance companies who will provide coverage to their respective employees. Employers also decide how much (if anything) their employees will contribute to the cost of coverage, *see* Ex. 1, Program Agreement, §§ 6.03, 7.01, 8.01(a), 8.01(b); and

- Employees of each participating employer decide which benefits they elect (if any), and the level of coverage (*e.g.*, employee-only; employee + spouse; employee + child; family coverage, etc.). *See, e.g.*, Exs. C-F, RingCentral Benefits Guides for 2016-2019, at 6-7.

### 1. Sequoia Serves as Broker to Employers and Administrator for the Program

Sequoia administers the Program on a day-to-day basis, prepares and files reports with government agencies, and keeps records concerning the Program's operation. Ex. 1, Program Agreement §§ 5.03, 5.04. Additionally—and key to the allegations in the Amended Complaint—each employer (such as RingCentral) that elects to participate in the Program appoints Sequoia as its broker. *Id.*, Schedule A, ¶ 6; Ex. B, RingCentral Services Agreement, §§ 3, 5. As broker, Sequoia facilitates the purchase of insurance policies offered through the Program, *see* Ex. 1, Program Agreement, §§ 7.01, 7.02, and the implementation of employers' coverage selections under those policies, *see id.*, §§ 6.02, 6.03, 6.04, 9.02; Ex. B, RingCentral Services Agreement, § 6. Each employer then pays "the total contributions required for participation in the Benefit Plans it offers to its Employees for the month." Ex. 1, Program Agreement, § 8.01(a).

The Program also includes administrative features for participating employers, such as consolidated billing, insurance premium billing reconciliation, electronic data interchange services, web portals and mobile apps for participants, COBRA services, annual preparation of Form 5500s (if applicable), and ongoing assistance and advice regarding all benefits programs. *See* Ex. B, RingCentral Services Agreement, § 1; *see also* https://www.sequoia.com/services/sequoia-tech/.

---

Ex. H, 2019 Form 5500 for Tech Benefits Program, Financial Statements, at 4 ("The Program offers fully insured medical, group life, accidental death and dismemberment, and optional life insurance policies through coverage agreements with a Contracted Insurance Carrier . . . .").

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## 2.    The Trust Fund Receives and Disburses Premiums to Insurers

The Program Agreement establishes a trust for the Program and designates Golub as the Trustee in connection with said fund. Ex. 1, Program Agreement, §§ 2.09, 2.10, 4.01. As relevant to this lawsuit, Golub's responsibilities are limited to receiving premiums from participating employers who elect to purchase insurance coverage through the Program, and then remitting such funds to the insurers selected by participating employers. *Id.*, §§ 2.09, 3.03, 4.02, 4.03, 8.03.

## 3.    Participating Employers Serve as Plan Fiduciaries, Decide Which Benefits to Offer and the Amount of Employee Contributions

Employers decide whether to join the Program and, if so, what insurance coverage options (if any) they wish to purchase through the Program. *Id.*, § 6.02. When an employer chooses to join the Program, it enters into several agreements. It agrees to the terms and conditions of the Tech Benefits Program. *See* Ex. A, RingCentral Adoption Agreement. Additionally, each employer—like RingCentral—enters into a "Services Agreement," under which it appoints Sequoia as its broker and the provider of the administrative features of the Program. *See* Ex. B, RingCentral Services Agreement, §§ 1, 5. Pursuant to this Services Agreement, ***employers expressly agree that Sequoia is entitled to the payment of commissions from insurance carriers***. *Id.*, § 5.

Plaintiffs admit that each participating employer (including RingCentral) maintains and administers its own plan for its employees. Am. Compl. ¶¶ 26, 33. Indeed, the Program Agreement confirms that each employer serves as the "Plan Administrator," "Named Fiduciary," and "Plan Sponsor" of its own plan, as defined in ERISA. *See* Ex. 1, Program Agreement, §§ 3.01(b), 7.01. Consistent with these roles, each employer has "complete authority and responsibility" for its plan's operation, funding, and benefits. *See* Am. Compl. ¶ 36; Ex. 1, Program Agreement, § 7.01.

Participating employers have sole discretion as to which—if any—insurance benefits to provide under their respective plans. *See* Ex. 1, Program Agreement, § 6.03 ("An Employer may change its participation in one or more benefit plans by written notice to the Administrator."); *see also* Ex. B, RingCentral Services Agreement, § 6 (providing that the employer "shall at all times be entitled, in its

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

sole and absolute discretion, to modify, expand, curtail, or eliminate the level and nature of benefit program afforded to employees . . . .").

Each employer also determines the amount (if any) that its employees will contribute toward the cost of insurance coverage, *see* Ex. 1, Program Agreement, § 8.01(b) ("Each Employer may determine from time to time the portion of the cost of the Benefit Plans that will be paid by the Employees of the Employer."), with the caveat that each employer must cover a minimum amount of the cost of the coverage, *id.*, Schedule A, ¶ 3. Further, a participating employer—in its capacity as "administrator" of its own plan—may be required by ERISA to file a Form 5500 annually with the Department of Labor disclosing, *inter alia*, the insurance carriers that insure plan benefits. *See, e.g.*, Exs. H-L (sample Form 5500 Annual Reports for RingCentral, Inc. Welfare Benefits Plan).

### 4.    Employees Choose Their Own Coverage From the Menu of Options Selected by Their Employer

Participating employers identify which employees will be eligible for benefits offered under their respective plans. Ex. 1, Program Agreement, § 7.01. Eligible employees then decide whether to accept coverage under their employer's plan and, if offered choice by their employers, which coverage options to select.[3] *See, e.g.*, Exs. C-F, RingCentral Benefits Guides for 2016-2019, at 6-7. Employees also decide their *level* of coverage (*i.e.*, employee only; employee + spouse; or family coverage), which impacts the amount employees may have to contribute toward coverage. *Id.*

## C.    RingCentral's Participation in the Program

Plaintiffs' employer, RingCentral, began participating in the Program in 2013. *See* Ex. B, RingCentral Services Agreement. It ceased participating in the Program as of December 31, 2019, Am. Compl. at 3 n.1, although it continues to utilize Sequoia as its insurance broker. Between 2013 and 2019, RingCentral elected insurance coverage options made available through the Program and, accordingly, offered a variety of insurance coverages (such as health, dental, vision, disability, and/or

---

[3] As discussed immediately below, RingCentral offered eligible participants a "waiver credit" of hundreds of dollars per month if they declined coverage under its Plan.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

life) to its employees from multiple insurers, including health insurance from Anthem and Kaiser Permanente. *See, e.g.*, Exs. C-F, RingCentral Benefits Guides for 2016-2019, at 6-7.

In addition to its decision to purchase insurance through the Program, **RingCentral** determined the amount—***if any***—that its employees would contribute toward the cost of such coverage. Notably, from at least 2016 to 2019, RingCentral covered the ***entire*** cost of "Employee Only" coverage for a number of different plan options (in which case, electing employees paid nothing for their coverage). *See id.* RingCentral offered and paid employees a "Waiver Credit" of hundreds of dollars per month if they declined coverage in RingCentral's plan. *See id.*

RingCentral's participation in the Program was memorialized by its execution, in 2013, of an Adoption Agreement—pursuant to which it agreed to the terms and conditions of the Program, *see* Ex. A, RingCentral Adoption Agreement—and a Services Agreement, pursuant to which it appointed Sequoia as its insurance broker and agreed that Sequoia was entitled to the payment of commissions from insurers. *See* Ex. B, RingCentral Services Agreement, §§ 3, 5.

For ease of reference, a graphic overview of roles in the Program is set forth below:

| Action | Employer | Sequoia | Trustee | Employee | Reference |
|---|---|---|---|---|---|
| Designs its product, the Tech Benefits Program, by identifying coverage options and policies to make available to employers. | | X | | | Ex. 1, Program Agreement, §§ 7.01, 7.02. |
| Appoints Sequoia as broker to assist in identifying possible insurance coverages for Employer's ERISA Plan. | X | | | | Ex. 1, Program Agreement, Sch. A, ¶ 6; Ex. B, RingCentral Services Agreement, §§ 3, 5. |
| Selects insurer(s) for its ERISA Plan, and, where it intends to purchase the insurance through the Program, executes a Program participation agreement. | X | | | | Ex. 1, Program Agreement, §§ 6.02, 6.03, 6.04, 9.02; Ex. B, RingCentral Services Agreement, § 6. |
| Approves the cost of the insurance coverage (the contributions/ | X | | | | Ex. 1, Program Agreement, §§ 8.01(a), (b). |

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

| Action | Employer | Sequoia | Trustee | Employee | Reference |
|---|---|---|---|---|---|
| premiums to be paid by its ERISA Plan). | | | | | |
| Maintains and administers an ERISA plan, serves as Administrator, Named Fiduciary, and Plan Sponsor. | X | | | | Ex. 1, Program Agreement, §§ 3.01(b), 7.01. |
| Determines the portion of the Plan's cost of coverage to be borne by employees ("employee contributions"). | X | | | | Ex. 1, Program Agreement, § 8.01(b). |
| Acts as intermediary between insurer and the ERISA Plan in collecting premiums, and remitting required amounts to the insurer. | | | X | | Ex. 1, Program Agreement, §§ 4.02, 4.03; Ex. G, Program 2019 Form 5500, Financial Statements, at 4. |
| Decides whether to elect insurance options available under the ERISA Plan, and, if so, what options (including corresponding employee contributions) from available health, dental, vision, life insurance, etc. options. | | | | X | Exs. C-F, RingCentral Benefits Guides for 2016-2019, at 6-7. |

## III.    STANDARD OF REVIEW

To establish Article III standing, a plaintiff "'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" MTD Op. at 1-2 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). Plaintiffs must "'clearly [] allege facts demonstrating each element'" of Article III standing. *Id.* at 2 (quoting *Spokeo*, 136 S. Ct. at 1547) (alteration in original). If a plaintiff lacks Article III standing, the Court has no subject matter jurisdiction. *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 908 (9th Cir. 2020). Accordingly, a challenge to a plaintiff's standing implicates Rule 12(b)(1). *Pomponio v. Brand Motors, LLC*, No. 19-CV-04750, 2020 WL 922450, at *2 (N.D. Cal. Feb. 26, 2020). A "facial" challenge to jurisdiction under Rule 12(b)(1) is based on sufficiency of the pleadings. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual challenge, however, the

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

defendant challenges the veracity of facts underpinning subject matter jurisdiction. *Id.* The court may consider matters outside of the pleadings to resolve a factual challenge, and the non-moving party does not have the benefit of Rule 12(b)(6) presumptions. *Id.* Here, Plaintiffs lack standing, both on the face of the Amended Complaint and as a factual matter based on the Program's terms and other judicially-noticeable facts.

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *The Depot, Inc. v. Caring for Montanans*, 915 F.3d 643, 652 (9th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *cert. denied*, 140 S. Ct. 223 (2019). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Insurance Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), legal conclusions and conclusory allegations—including those contradicted by documents referenced in a complaint—are not entitled to be assumed true. *Twombly*, 550 U.S. at 554-55; *Manzarek*, 519 F.3d at 1031.

## IV.     ARGUMENT

### A.     Plaintiffs Have Still Not Established Article III Standing

In its MTD Opinion, the Court found that "Plaintiffs' Complaint does not clearly allege ***facts*** that satisfy even the ***first*** element of Article III standing." MTD Op. at 4 (emphasis added); *see also* Hr'g Tr. at 17:9-13 ("[I]t's plaintiffs' burden to show standing, and . . . . there's just way too little here to get there."). Consistent with this Court's MTD Opinion, the Supreme Court just last month reiterated that plausible ***factual*** allegations of ***actual*** injury that are ***traceable*** to a defendant's conduct are necessary for Article III standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). Despite this Court's affording Plaintiffs another opportunity to cure their pleading deficiencies—which the Court highlighted and explained to them— Plaintiffs have failed to do so.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**1.     Plaintiffs Have Not Alleged a Concrete Injury**

As a preliminary matter, Plaintiffs purport to represent a nationwide class comprising all participants in ERISA-covered health and welfare insurance plans obtained through the Tech Benefits Program since January 11, 2015, who contributed to the cost of any such insurance. Am. Compl. ¶ 71. But the Amended Complaint does *not* allege that either named Plaintiff contributed *anything* toward the cost of *any* insurance coverage that they elected under RingCentral's Plan in 2015 or 2016. Specifically, Plaintiff Beichle only alleges that she contributed toward her insurance coverage in 2018 and 2019. *Id.* ¶¶ 10-14. And Plaintiff Winsor only alleges that she contributed toward the cost of coverage in 2017 and 2018. *Id.* ¶¶ 16-18. (And if this case goes forward, the evidence will show that, other than the years they affirmatively put at issue, both elected zero-dollar benefit options that RingCentral offered its employees). Absent plausible factual allegations of actual injury in *each* of the years in question, Plaintiffs cannot maintain this action on behalf of the purported class. *See TransUnion*, 141 S. Ct. at 2212-13. Putting that aside, however, the Amended Complaint still fails to allege a plausible "injury" even as to the *named* Plaintiffs during the two years that each of them allegedly contributed to the cost of their insurance coverage.

In their first Complaint, Plaintiffs' sole allegation of injury during the years at issue was that their contributions for coverage would have been less but for Defendants' alleged violations of ERISA. MTD Op. at 2. The Court found that Plaintiffs failed to adequately plead an injury-in-fact because they did not allege "*any facts as to how their premiums are calculated*." *Id.* at 3 (emphasis added); *see also* Hr'g Tr. at 5:10-11 ("There's zero allegation[s] with respect to how plaintiffs' contributions are calculated."). The Court explained that "[w]ithout any allegations as to how RingCentral determined Plaintiffs' contributions for their benefits[,] there are not facts alleged that plausibly suggest that *had the amounts RingCentral was required to pay been lower <u>it would have asked its employees to pay less</u>*." MTD Op. at 3 (emphasis added). This remains the case now.

The Amended Complaint, like the first one, alleges just one thing:  that Plaintiffs paid too much out-of-pocket for insurance coverage. *See* Am. Compl. ¶¶ 10-25. But the Amended Complaint does not address the Court's fundamental question:  "*had the amounts RingCentral was required to pay*

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

***been lower[,] . . . <u>would [RingCentral] have asked its employees to pay less[?]</u>***"  MTD Op. at 3 (emphasis added); *see also* Hr'g Tr. at 3:3-9 ("I don't see factual allegations that plausibly suggest . . . that because . . . the contributions that are charged to RingCentral are too high, they would be lower otherwise, that RingCentral would pass that on to the employees.").

The Amended Complaint now discusses how much Plaintiffs allegedly contributed for insurance that they elected under the RingCentral Plan (in some years), revealing it to be a flat dollar amount—and ***not*** a percentage of premium cost—each pay period.  Am. Compl. ¶¶ 11-18.  But that fact does not establish an injury—it simply reveals what RingCentral required them to contribute.  Plaintiffs attempt to overcome this pleading deficiency by now alleging—without citation to any exhibit (or context)—that RingCentral supposedly told Plaintiff Beichle (on a date not revealed) how it sets employee contributions.  RingCentral's alleged explanation, *see* Am. Compl. ¶ 15, however, ***undercuts*** Plaintiffs' allegation of injury.  Specifically, Plaintiffs allege that:

> RingCentral . . . ***did <u>not</u> identify a specific formula or set of factors for determining the employee share***.  RingCentral cited "***<u>various factors and discussion</u>***" and stated that "[t]he company contributes 80-90% of the cost for employee medical benefits."

Am. Compl. ¶ 15 (emphases added).[4]  Putting aside that Plaintiffs do not attach this alleged statement from RingCentral to their Amended Complaint, and that paragraph 15 is hearsay upon hearsay, nothing in this supposed statement tells the Court whether employee contributions would have been lower if RingCentral's overall premium had been lower.  Indeed, RingCentral's alleged statement ***disclaims*** that there is a formula as to how RingCentral sets employee contribution rates, and instead advises that an employee's share of premium cost (if any) is based on what Plaintiffs ***quote*** as "***<u>various factors and discussion</u>***[.]"  In other words, there is no formula, and no way by which Plaintiffs can plausibly allege that, if RingCentral's overall premium costs had been lower, it would have resulted in lower employee contributions.  Put simply:  Plaintiffs' Amended Complaint is no different than their first Complaint, which the Court dismissed.  Hr'g Tr. at 8:3-8 ("[The Court:] There's no single factual allegation with

---

[4] Paragraph 15 first alleges that "'[t]he ***company*** contributes 80-90% of the cost for employee medical benefits."  But in the next sentence, it alleges that "Defendants advise employers that a 'common strateg[y]'" . . . is to require ***employees*** to pay 90% of the required contribution for their own coverage and 75% for family members."  *Id.* (emphasis added).  We believe the second sentence is an error, as it contradicts the text of the Program Agreement.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

respect to how much [money] they pay, how – what percentage [is it], nothing right?" "Mr. Specht: Well, I think – you're right. There's not a formula. There's not a percentage.").

RingCentral's supposed statement that "[t]he company contributes 80-90% of the cost for employee medical benefits," also fails to establish an injury. Among other things:

- It only purports to address RingCentral's general approach to the employer/employee share of premium costs as it relates to *medical* benefits, and none of the other types of coverage that Plaintiffs allege they elected (such as dental, vision, or life);

- It reveals that it is RingCentral alone—and not Defendants—who set the employee contribution rate (if any), and that it is a sliding scale where ***RingCentral*** determines what amount (if any) it requires employees to contribute, based on "various factors and discussion[]"; and

- The alleged statement—assuredly received only *after* Plaintiffs' first Complaint was dismissed for lack of standing—is written in the present tense ("[t]he company contribute**s** 80-90% of the cost for employee medical coverage").[5] By its own terms, the statement does not, in any way, address how RingCentral set employee contribution rates in 2017, 2018, or 2019, which are the *only* years when Plaintiffs allege they paid contributions toward coverage. And during those years, RingCentral offered *zero*-dollar options to participants who elected medical coverage, which belies Plaintiffs' claim that overall premium cost impacted employee contribution rates.

There are simply no plausible facts alleged to support a claim of "injury" during the years at issue. Additionally, contrary to the Amended Complaint's insinuation (in Paragraph 15) that RingCentral formulaically covered between 80-90 percent of premium costs in the years at issue—which suffers from the infirmities described above—the flat-dollar employer/employee contribution rate for medical coverage that Plaintiffs affirmatively plead (in Amended Complaint ¶¶ 11-12) reveal that at least as to Plaintiff Beichle, RingCentral covered 95 percent of her medical premium cost in 2018, well

---

[5] *See* Hr'g Tr. at 8:1-10; 14:10-23 (exchange between the Court and Plaintiffs' counsel where Plaintiffs admitted they had no knowledge of a percentage or formula by which employee contribution rates were determined).

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

in *excess* of the percentage that Plaintiffs now insinuate was RingCentral's blanket coverage formula. Respectfully, the disconnect between actual facts—that employee contributions are determined by RingCentral alone based on "various factors and discussion" (Am. Compl. ¶ 15)—and Plaintiffs' unsupported allegation that employee contributions go up and down in accordance with a formula tied to overall premium rates—cannot be clearer.

In its MTD Opinion, the Court discussed at some length the Second Circuit's decision in *Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181 (2d Cir. 2005), which was the only case offered by Plaintiffs at oral argument regarding causation for Article III standing. *See* Hr'g Tr. at 16:16-17:5. In *Central States*, the Second Circuit held that "there were serious questions whether the drug plan participants—as opposed to the drug plan itself—had suffered any injury due to alleged inflated prices for prescription drugs because the plan participants generally pay a *flat co-pay* regardless of the cost of the drug." *Id.* (emphasis added). In so ruling, the Second Circuit suggested that to extent participants had paid a *percentage* of drug cost as their co-pay, those participants *might* have a cognizable injury-in-fact. *Id.* (emphasis added).

In their Amended Complaint, Plaintiffs seem to allege that, because RingCentral (currently) purports to set its employer contribution rate for *medical* coverage—alone—at anything "between" 80-90 percent of premium cost, they plausibly allege an injury under *Central States* (because employees pay between 10-20 percent of premium cost). But even if credited, this alleged statement does not address how RingCentral set its employee contribution rates (if any) in 2017, 2018, or 2019, when Plaintiffs were allegedly injured. Additionally, RingCentral specifically disclaimed that it utilizes any specific formula to establish employee contribution rates—advising instead that such rates are informed by "various factors and discussion." Am. Compl. ¶ 15. Nowhere in their Amended Complaint do Plaintiffs allege that they actually paid a *percentage* of the overall premium for the insurance coverage they elected, such that if RingCentral was required to pay lower premiums, it would have, in turn, required Plaintiffs to contribute less. *Cf.* MTD Op. at 3. Indeed, ***Plaintiffs' own allegations reveal that they paid only a flat dollar amount for each type of insurance coverage they elected during the years***

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*at issue*, with **no** factual allegation that such amount was a percentage of the overall premium rate. Am. Compl. ¶¶ 11-14, 17-18.[6]

Even accepting Plaintiffs' allegations that Defendants' receipt of commissions violated ERISA—which it did not for reasons discussed *infra*—Plaintiffs have, at best, alleged a statutory violation that did not cause them actual harm. As such, the Amended Complaint should be dismissed, especially in light of the Supreme Court's recent guidance that an alleged statutory violation, without actual harm to the plaintiff, cannot give rise to Article III standing. *See*, *e.g.*, *TransUnion*, 141 S. Ct. at 2205, 2209 ("under Article III, an injury in law [*i.e.*, a statutory violation] is not an injury in fact," and "[o]nly those plaintiffs who have been **concretely harmed** by a defendant's statutory violation may sue that private defendant over that violation in federal court."); *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020) (plaintiffs had not established any "concrete" harm because even if the plaintiffs "were to win . . . they would still receive the exact same monthly benefits that they were already slated to receive . . . .").

### 2.    Plaintiffs Fail to Plausibly Allege Traceability

Plaintiffs also fail to plead the second element of Article III standing: traceability. In its MTD Opinion, the Court noted that Article III standing requires "a sufficient 'causal connection between the injury and the conduct complained of,'" and cautioned that "[s]tanding theories that depend on a 'speculative chain of possibilities'—such as those that turn on 'the decisions of independent actors'—lack the necessary causal connection." MTD Op. at 2. The Supreme Court recently echoed this Court: "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , 'standing is not precluded, but it is ordinarily **substantially** more difficult to establish.'" *California*, 141 S. Ct. at 2117 (emphasis added).

---

[6] Plaintiffs do not allege that RingCentral was **obligated** to contribute 80-90% of contributions for their employees' coverage. *Cf. id.* ¶ 15. Nor could they. As the Court already observed, the Program Agreement sets a "floor" for the percentage of the total cost of coverage that an employer must pay. MTD Op. at 3; *see also* Ex. 1, Program Agreement, Schedule A. The Program Agreement does not require that **employees** pay a specific percentage of the cost of their coverage, or **any** amount at all. Plaintiffs' contributions are thus analogous to the "flat co-pay" which the Second Circuit deemed inadequate to allege an injury-in-fact in *Central States*. *See* 433 F.3d at 202.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs' barebones and unsupported theory of injury in their Amended Complaint—that they paid higher employee contributions under the RingCentral Plan than they should have, *see* MTD Op. at 3, involves intervening acts by third parties—insurance carriers and Plaintiffs' employer, RingCentral—over which Defendants had no control whatsoever.

*First,* courts have recognized that insurance premiums are determined through an interactive process involving multiple parties, driven by an insurer's underwriting process. For example, in a challenge to the individual mandate contained in the Affordable Care Act ("ACA"), the court in *Butler v. Obama*, 814 F. Supp. 2d 230, 240 (E.D.N.Y. 2011), concluded that "***insurance companies have broad discretion in the setting of premiums***, and plaintiff has failed to allege any basis for concluding that the elimination of the individual mandate will result in insurance premium decreases for the health coverage that he currently seeks to purchase." *Id.* (emphasis added). In another ACA challenge, the court concluded that, because "***health insurance premiums fluctuate for myriad reasons, ranging from the particular terms of coverage to various other actuarial factors***," plaintiffs failed to plead facts establishing a causal link between the statute and premium increases, thus depriving plaintiffs of Article III standing. *See Am. Freedom L. Ctr. v. Obama*, 106 F. Supp. 3d 104, 109 (D.D.C. 2015) (emphasis added), *aff'd*, 821 F.3d 44 (D.C. Cir. 2016).

ERISA incorporates relevant ACA provisions as they apply to group health plans. *See* 29 U.S.C. § 1185d(a)(1). Even without such incorporation, Article III standing is not present here. As both *Butler* and *American Freedom Law Center* hold, a plaintiff does not have standing to sue a defendant over allegedly higher premium rates that are the product of decisions made by independent actors. That is precisely the scenario in this case, given that premiums for insurance options offered through the Tech Benefits Program are determined by the independent decisions of insurance carriers and participating employers. Indeed, the Program Agreement expressly provides that each "Employer ***must submit to the Anthem underwriting process***." Ex. 1, Program Agreement, Schedule A, ¶ 9 (emphasis added). In other words, the Program Agreement makes clear that ***the carrier's*** underwriting process determines the premiums charged to RingCentral (and other participating employers). Accordingly, Plaintiffs do not (and cannot) plausibly allege that their premiums were higher because of Defendants' conduct.

*Second,* it is participating employers—like RingCentral—that elect insurance coverages under the Program to offer to their employees and approve the premium rates for those coverages. Employers also determine what amount of that overall cost—if any—employees will pay (subject to minimums employers must pay under the Program's terms). Indeed, Plaintiffs admit that employers are responsible for "determining the employee share of contributions," *see* Am. Compl. ¶ 36—consistent with the Program Agreement, which provides that "*[e]ach Employer* may determine from time to time the portion of the cost [*not the percentage*] of the Benefit Plans that will be paid by the Employees of the Employer." *See* Ex. 1, Program Agreement, § 8.01(b) (emphasis added).

Plaintiffs' admission that RingCentral set employee contributions defeats their claim that Defendants caused their alleged injury. Even if Plaintiffs are correct (and they are not) that commissions paid to Sequoia were somehow excessive, or that RingCentral paid too much in premiums, *RingCentral alone determined how much (if anything) Plaintiffs had to contribute*. *See* Am. Compl. ¶ 36. The Program only requires that an employer pay *a minimum amount* of the cost of coverage—employers are free to pay the entirety of the premium, or any other amount above the Program minimum. And Plaintiffs admit that RingCentral aims to contribute well *above* the Program minimum. Am. Compl. ¶¶ 11-12, 15. Indeed, there can be no dispute that, during the years at issue, RingCentral offered its employees *zero-dollar* coverage options, reflecting that commissions paid to Sequoia—by third party insurers (*not* the RingCentral Plan)—have no correlative (let alone causative) relationship to employee contribution rates that RingCentral sets.

The MTD Opinion underscores the critical role that insurance carriers and employers play in determining how much (if anything) employees pay toward the cost of their coverage. The Court concluded that Plaintiffs' initial pleading alleged "[n]o facts" that "support a plausible inference that if Defendants had not charged the insurers a commission (1) the insurers would have charged the RingCentral Plan less, or (2) even if the insurers would have charged RingCentral less for the coverage, RingCentral would have reduced the amount of their employees' required contributions." MTD Op. at 3. The Amended Complaint, however, does not include a credible allegation that insurance carriers would have charged lower premiums but for the commissions and fees paid to Sequoia, *or* that

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

RingCentral would have lowered employee contributions if overall premiums for coverage were less. Accordingly, Plaintiffs have not plausibly alleged that Defendants caused their purported injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

### 3. Plaintiffs' Purported Injury is Not Redressable

The fact that RingCentral sets its employees' contribution rates also creates a redressability issue that is fatal to Plaintiffs' Article III standing. *Id.* ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision'"). For example, in *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123 (9th Cir. 2006), the Ninth Circuit considered Article III standing where plaintiffs alleged that the defendant "charged the plans too much for drugs, and that this caused the plans to demand higher co-payments ***and contributions*** from participants." *Id*. at 1125 (emphasis added). The plaintiffs asserted that they had Article III standing because "if their suit is successful, the plans' drug costs will decrease, and that the plans might then reduce contributions or co-payments." *Id.* The Ninth Circuit disagreed, finding that "nothing would force [the defendant or the plaintiffs' plan's sponsor] to do this, nor would any one-time award to the plans for past overpayments inure to the benefit of participants. [The defendant and plan sponsor] would be free to reduce their contributions or cease funding the plans altogether until any such funds were exhausted." *Id.* Accordingly, the Ninth Circuit held that "[t]here is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.*

Attempting to circumvent this redressability issue, the Amended Complaint asserts: "[i]f Plaintiffs are successful in recovering Defendants' commissions on behalf of the Plans and the Class, Plaintiffs will *likely* receive a distribution or credit equal to the portion of the recovered commissions funded by their contributions." *See* Am. Compl. ¶ 22 (emphasis added). Tellingly, however, Plaintiffs cite no legal or factual authority for this patently speculative claim. And Plaintiffs' repeated claims that they are seeking equitable remedies, such as "restitution," "disgorge[ment]," and "constructive trust," under 29 U.S.C. §§ 1132(a)(2) and (a)(3), *see id.* ¶¶ 6, 82, are without merit, and contravene the express language and design of ERISA.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

*First*, under 29 U.S.C. § 1132(a)(2), Plaintiffs may seek "appropriate relief under [29 U.S.C. § 1109]" for a fiduciary breach, which includes an order "to make good *to such plan* any losses to the plan resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary" (emphasis added). The plain language of 29 U.S.C. § 1109 thus makes clear that any recovery under 29 U.S.C. § 1132(a)(2) would be paid *to the RingCentral Plan*—not directly to Plaintiffs or other putative class members.

*Second*, as discussed in Section IV.B below, Plaintiffs fail to allege plausibly that Defendants had fiduciary duties to the RingCentral Plan or its participants with respect to Sequoia's receipt of commissions from carriers. And, Plaintiffs fail to allege plausibly that they would be entitled to (a)(3) relief against Defendants as non-fiduciaries. The Ninth Circuit has ruled that neither "restitution" nor "disgorgement" of profits are forms of "appropriate equitable relief" available under 29 U.S.C. § 1132(a)(3) from non-fiduciaries where, as here, Plaintiffs have not identified any specific account or funds from which the allegedly ill-gotten commissions could be recovered or to which they can be traced. *The Depot, Inc.*, 915 F.3d at 662-64. In such circumstances, the relief sought is not "equitable" under § 1132(a)(3). *Id.* at 665.

Additionally, Plaintiffs' claim that the Court can impose a constructive trust is defeated by Plaintiffs' own allegations in the Amended Complaint. It is well-settled that "where 'the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor,' and the plaintiff 'cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant].'" *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002) (alterations in original). Here, Plaintiffs allege that RingCentral paid employer and employee contributions into the Program's bank account, and that "Defendants distributed the contributions to insurers on a weekly or monthly basis *and did not hold contributions in reserve or otherwise generate and retain a surplus year-to-year*." Am. Compl. ¶ 20. If Plaintiffs' allegation is assumed to be true, then they admit that they cannot trace the amounts at issue, which eliminates any claim to a constructive trust. Even if a constructive trust was permissible here, Plaintiffs plead for a

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

remedy in search of a constitutional injury. But as this Court has already noted, a potential remedy does not prove injury. Hr'g Tr. at 6:17-18.

**B.     Defendants Were Not Fiduciaries as Alleged in the Amended Complaint**

Plaintiffs assert two causes of action against Defendants: prohibited transactions in violation of 29 U.S.C. § 1106(a)-(b), Am. Compl. ¶¶ 79-82, and breach of fiduciary duties in violation of 29 U.S.C. § 1104(a)(1)(A)-(B), *id.* ¶¶ 83-86. The "threshold question" for both claims is whether Defendants were acting as fiduciaries as to the alleged conduct at issue. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (The "threshold question" in "every case charging breach of ERISA fiduciary duty" is whether the defendant was "***acting as a fiduciary*** (that is, was performing a fiduciary function) ***when taking the action subject to complaint***") (emphasis added). If Defendants did not act as fiduciaries when selecting the insurers and insurance policies to be included in the Program or in accepting commissions from those insurers, Plaintiffs' claims fail as a matter of law.

There are two types of fiduciaries under ERISA: "named" and "functional" fiduciaries. *See The Depot, Inc.*, 915 F.3d at 653. A "named fiduciary" is designated "in the plan instrument" as a fiduciary, *see* 29 U.S.C. § 1102(a)(2), but only with respect to duties granted in that instrument. *Daniels v. Nat'l Emp. Benefit Servs., Inc.*, 858 F. Supp. 684, 690 (N.D. Ohio 1994) ("named" fiduciary not necessarily fiduciary for all purposes if plan documents designate separate functions). Also, a party is a "functional" fiduciary to a plan only to the extent "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Plaintiffs' Amended Complaint still fails to allege any facts that could plausibly establish that Defendants acted as fiduciaries, either named or functional, ***with regard to the conduct at issue***—the selection of insurers and insurance policies to be made available through the Program at stated premium and commissions rates. Instead, RingCentral acted as the sole fiduciary of its Plan when it decided to purchase one or more of the insurance policies available through the Program. Accordingly, the Amended Complaint should be dismissed for failure to state a claim.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

**1.    Defendants Were Not Fiduciaries with Respect to the RingCentral Plan's Purchase of Insurance though the Tech Benefits Program**

Each employer decides in its sole discretion whether to purchase insurance through the Program and what insurance coverage options will be offered to employees. *See* Ex. 1, Program Agreement, § 6.02 ("An eligible company may elect to participate in one or more of the Benefit Plans offered under the Program at any time by making written request to the Administrator."); *id.*, § 6.03 ("An Employer may change its participation in one or more benefit plans by written notice" to Sequoia); *id.*, § 6.04 ("An Employer may terminate its participation in the Program by written notice" to Sequoia); Ex. B, RingCentral Services Agreement, § 6 (an employer "shall at all times be entitled, in its sole and absolute discretion, to modify, expand, curtail, or eliminate the level and nature of benefit programs afforded to employees . . . ."). Defendants lack authority to make any decision for any participating employer or plan as to the insurer or policy used to fund its employees' benefits, and the extent to which any costs will be shared by employees. *See* Ex. 1, Program Agreement, § 8.01(b); *see also* Am. Compl. ¶ 36 (acknowledging that employers "determin[e] the employee share of contributions"). As recognized in *Mahoney v. J.J. Weiser & Co.*, 564 F. Supp. 2d 248 (S.D.N.Y. 2008), *aff'd*, 339 F. App'x 46 (2d Cir. 2009), an insurance broker through whom insurance coverage is placed is not a fiduciary in connection with a plan's purchase of the policy, or the approval of the policy premiums or commissions, where the broker did not have the authority or ability to cause the plan to purchase the policy or pay the premiums. *Id.* at 257.

The fact that Sequoia designed the Program—through which a participating employer could select which (if any) of the available coverage options it wanted to purchase—does not change the analysis. Courts have recognized in multiple ERISA contexts that product design—such as offering a menu of products as part of a program or package—is ***not*** fiduciary activity.

For example, there have been scores of cases challenging the common practice of 401(k) plan recordkeepers negotiating for, and collecting fees from, mutual funds offered as options on their investment menus (commonly referred to as "revenue sharing payments"). Plaintiffs in those cases have argued that recordkeepers act as fiduciaries in assembling these menus and any payments they receive

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

from the selected funds constitute fiduciary breaches. Courts in this circuit and others have consistently rejected this characterization of the recordkeepers' activities, holding instead that, when designing the menu of funds offered under its product, recordkeepers are *not* acting as fiduciaries for plan clients and therefore their receipt of the fund payments is not a fiduciary breach. *See, e.g.*, *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 838 (9th Cir. 2018) ("A service provider is plainly not involved with plan management when . . . compiling a list of proposed investment options."); *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 911-12 (7th Cir. 2013) ("[S]electing both funds and their share classes for inclusion on a menu of investment options offered to 401(k) plan customers does not transform a provider of annuities into a functional fiduciary."); *Santomenno v. John Hancock Life Ins. Co. (USA)*, 768 F.3d 285, 295 (3d Cir. 2014) (service provider was not fiduciary in composing "[its] Big Menu, including its selection of investment options and the accompanying fee structure," because the "fund selections and expense ratios are 'product design' features of the type that . . . do not give rise to a fiduciary duty.").

The First Circuit's recent decision in *In re Fidelity ERISA Fee Litigation*, 990 F.3d 50 (1st Cir. 2021), is on point. In that case, Fidelity offered 401(k) plans recordkeeping services, as well as access to a "supermarket" (the "FundsNetwork") with thousands of mutual funds. *Id.* at 54. The plans agreed to pay Fidelity a fee for recordkeeping and, separately, Fidelity collected an "infrastructure fee" from funds to be included on the FundsNetwork. *Id.* at 55. The plaintiffs claimed that Fidelity breached fiduciary duties to the plans because the infrastructure fee "effectively increased the amount of compensation [Fidelity] received from the plans." *Id.* at 56.

The First Circuit rejected this argument. Instead, it found that Fidelity's *customer*—not Fidelity—selected the mutual funds to offer to plan participants under its plan and was the fiduciary in making this choice. *See id.* at 57-58. Plan participants then chose investments for their own accounts from among the funds made available by their employer. *See id.* Given these "numerous intervening and independent decisions," Fidelity did not act as a fiduciary to select plan investment options and therefore did not exercise fiduciary control over its compensation when it negotiated for and collected the infrastructure fees from mutual funds. *Id.* at 56.

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Similarly, in other contexts, courts have also rejected claims that those who develop products or services for plans are fiduciaries.  For example, courts have held that pharmacy benefit managers ("PBMs") providing prescription drug administrative services to ERISA plans do not act as fiduciaries when assembling pharmacy networks to make available to plan customers, or when negotiating prices that plans will pay for drugs dispensed to their participants.  *See*, *e.g.*, *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 477 (7th Cir. 2007) (PBM's proprietary arrangement with network pharmacies was part of its administration of its own business as a PBM, and not fiduciary in nature); *Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44, 47-49 (2d Cir. 2020) ("Anthem did not act as an ERISA fiduciary when it entered into the [PBM] Agreements, even though its decisions may ultimately affect how much plan participants pay for drug prices[,]" and PBM did not act as a fiduciary in negotiating its compensation).  This is because these activities involved the PBM's design and administration of ***its own product***, which are activities "separate and distinct from" the PBM's relationship with plan customers.  *See Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 677-78 (M.D. Tenn. 2007) (PBM's "contracting with retail pharmacies in its proprietary network—is separate and distinct from [its] contractual relationship with" customers).

Here, the Program is a pre-packaged product—offering employers a menu of selected insurance coverage options and a suite of administrative services.  When designing its product, Sequoia, *inter alia*, identified insurers willing to offer specified insurance coverages to participating employers at specified premium and commission rates.  Sequoia did not act on behalf of any employer when doing so.  Instead, Sequoia's conduct was akin to that of Fidelity in assembling its "supermarket" of mutual funds, *see In re Fidelity ERISA Fee Litigation*, 990 F.3d at 54, and PBMs in administering their business by assembling proprietary pharmacy networks and negotiating drug prices.  *See Caremark*, 474 F.3d at 477.

Indeed, Sequoia makes its product—the available coverages at quoted premium rates (and the associated commissions), with accompanying administrative services—available to employers as an insurance option ***they*** may select.  Employers alone decide whether they wish to purchase for their plans

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

one or more of the coverages available through the Program.[7]  As in *Fidelity*, here, employers have multiple insurance options available to them, both within and outside of the Program.  An employer working with Sequoia as broker could choose to purchase an insurance policy directly from any number of insurers on its own, or an insurance coverage option offered through the Program—such as the pooled Anthem coverage that the Program offers, which is largely the focus of Plaintiffs' Amended Complaint.  *See* Am. Compl. ¶ 42 (alleging that "Defendants select the insurance providers for each benefit ***available*** to the Plans") (emphasis added); *see also id.* ¶ 38 (alleging Golub is authorized to, *inter alia*, "[d]etermine the benefits ***available*** to Plans") (emphasis added).  But employers—not Defendants— have the "final say" as to whether to purchase insurance through the Program at the quoted premium rates, and which of the Program's coverage options is best for their plans.  *See Hecker v. Deere Co.*, 556 F.3d 575, 583 (7th Cir. 2009) (recordkeeper did not act as a fiduciary when constructing its menu of investment options, because the employer had the "final say" on investment options offered to its employees).

Defendants do not, and cannot, decide whether an employer will choose to purchase the insurance made available through the Program at the rates quoted.  Indeed, despite the fact that Defendants raised this exact point in their opening Motion, *see* Mot. to Dismiss Compl. (ECF 35) ("MTD"), at 14, the Amended Complaint lacks any allegation that ***Defendants*** decided that the RingCentral Plan would purchase insurance coverage or policies through the Program or which Program coverages would be offered to RingCentral employees.  Further, the Amended Complaint is noticeably silent regarding ***RingCentral's*** approval of the premium rates and commissions—points which Defendants also raised in their opening Motion.  *See* MTD at 18-19.

---

[7] As discussed *supra*, Plaintiffs admit that ***employers*** set the rate (if any) of employee contributions. Given that Defendants had no role in setting employee contribution rates—which is Plaintiffs' sole alleged "injury"—they cannot have been fiduciaries with respect to such activity.  Moreover, it is well-settled that plan design is a "settlor" function, not subject to ERISA's fiduciary standards of conduct. *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1102 (9th Cir. 2004) ("As the Supreme Court clearly stated in *Lockheed*, "because [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review." 517 U.S. at 890); *Ronches v. Dickerson Emp. Benefits, Inc.*, No. CV0904279, 2009 WL 10669571, at *11 (C.D. Cal. Oct. 30, 2009) ("'Decisions made by [a person or entity] while acting in its settlor capacity do not trigger ERISA's fiduciary duties.'").

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

The absence of such allegations is hardly surprising, given Plaintiffs' prior judicial admission that each *employer independently* selects which type of coverage offered by the Program (if any) it will offer to its employees, and the insurer for such coverage. *See* Opp'n to Mot. to Dismiss (ECF 46), at 11:4-6. If an employer wishes to use the insurers and coverages offered under the Program at the rates quoted, the employer can elect to purchase insurance through the Program. If so, Sequoia is contractually entitled to receive a commission payment, which is part and parcel of the pre-packaged product that the employer selected—and no violation of ERISA occurs. *See Mahoney*, 564 F. Supp. 2d at 257 (insurance broker through whom coverage is placed is not fiduciary in connection with a plan's purchase of the policy, and receipt of commissions does not violate ERISA). If the employer chooses not to purchase the insurance policies available through the Program, it will simply look elsewhere to provide benefits coverage to its employees. *See*, *e.g.*, *The Depot, Inc.*, 915 F.3d at 655 ("Because the potential purchaser of the insurance policy remains free to reject the insurer's product and select another, the insurance company is plainly not involved in plan management when negotiating premium rates") (cleaned up); *Santomenno*, 883 F.3d at 838 (plan sponsor exercises discretionary control over plan management when it "decides whether to agree to the service provider's terms"); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1003 (8th Cir. 2016) (before signing agreement with service provider, plan fiduciary "remained free" to reject agreement and find alternative provider).

Because participating employers retain "complete authority and responsibility" for their respective plans, including the "operation, funding and the benefits provided thereunder," Ex. 1, Program Agreement, § 7.01, and select and approve the insurers, coverages, and premium rates for the policies offered to employees under their plans, neither Sequoia nor Golub are fiduciaries for these decisions. Contrary to Plaintiffs' allegation, Defendants did not—and could not—"grant[] themselves control over the costs charged to the Plans." Am. Compl. ¶ 4; *see also Mahoney*, 564 F. Supp. 2d at 257 (broker was not fiduciary because it did not have "discretion or authority to purchase the insurance policies or to approve the payment of premiums"). Nor did Defendants "act with respect to 'assets of the Plans'" or engage in "transactions involving 'asset of the Plans'" in connection with the *conduct at issue—i.e.*, Defendants' selection of carriers, policies and coverages to make *available* to employers

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

through the Program—which all involved design of its product, the Program. *Cf.* Am. Compl. ¶ 45. RingCentral alone acted as a fiduciary with respect to its Plan's assets when it chose to purchase policies through the Program. Accordingly, Defendants did not act as fiduciaries when designing the Tech Benefits Program and making it available to employers.

### 2. Sequoia Was Not a Fiduciary With Respect to Disclosed Commissions

Sequoia did not act as a fiduciary when receiving commissions for its brokerage and administrative services because it expressly disclosed its receipt of those commissions in its contract with RingCentral. A service provider, such as Sequoia, does not act as a fiduciary when negotiating the terms of its contract, including its compensation, with an ERISA plan represented by its own fiduciary. *See Santomenno*, 883 F.3d at 838 ("A service provider is plainly not involved in plan management when negotiating its prospective fees . . . ."); *Caremark*, 474 F.3d at 477 ("There is no fiduciary liability for acts that precede fiduciary status."); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) ("When a person who has no relationship to an ERISA plan is negotiating a contract with that plan, he has no authority over or responsibility to the plan and presumably is unable to exercise any control over the trustees' decision whether or not, and on what terms, to enter into an agreement with him. Such a person is not an ERISA fiduciary with respect to the terms of the agreement for his compensation."); *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1132 (7th Cir. 1983) (holding that insurer and plan entered into "an arm's length bargain presumably governed by competition in the marketplace" and thus insurer was not a fiduciary with regard to the "terms and conditions upon which it became a provider," including its compensation).

The Ninth Circuit has recognized that, when a plan is negotiating terms of a service provider's contract, the plan is free to walk away and select another service provider. *Santomenno*, 883 F.3d at 838 (service provider had no fiduciary duty in negotiating its fee because "'nothing prevented the trustees from rejecting the provider's product and selecting another service provider; the choice was theirs.'"). That is because, "at that stage, 'discretionary control over plan management'" lies with the entity who "decides whether to agree to the service provider's terms." *Id.*

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Further, Sequoia did not act as a fiduciary when receiving commissions from insurers because it followed the terms of its contracts with employers participating in the Program—which expressly provide for Sequoia to collect commissions from insurers selected by participating employers—when doing so. *See* Ex. B, RingCentral Services Agreement, § 5 ("Client agrees to pay or provide for the compensation of Sequoia for Services during the term of this Agreement by designating Sequoia as the broker-of-record entitled to the payment of commissions by all affected insurance carriers."). As explained by the Seventh Circuit, "[n]o discretion is exercised when an insurer merely adheres to a specific contract term." *Ed Miniat, Inc. v. Glob. Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986); *see also Seaway Food Town, Inc. v. Med. Mut. of Oh.*, 347 F.3d 610, 619 (6th Cir. 2003) ("[W]here parties enter into a contract term at arm's length and where the term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right."); *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 678 (S.D.N.Y. 2018) (A service provider "is entitled to retain payments 'in excess of costs' if 'the contract expressly authorizes the withholding' or 'simply does not require [a party] to pass along all the savings.'") (alterations in original), *aff'd sub nom. Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020).

In an analogous context, courts have found that PBMs do not act as fiduciaries with regard to their compensation when they negotiate and retain prescription drug rebates payable by drug companies based on drug sales to the PBM's client plans, where their contracts allow them to do so. *See Caremark*, 474 F.3d at 472 (PBM was not fiduciary when negotiating drug rebates with drug companies, where plan agreed that PBM could retain rebates over fixed amount); *Express Scripts, Inc.*, 837 F. App'x at 49 ("[W]hen a PBM sets prices for prescription drugs pursuant to the terms of a contract, it is not exercising discretionary authority and therefore not acting as an ERISA fiduciary."); *In re Express Scripts, Inc. PBM Litig.*, No. 4:05-MD-01672, 2008 WL 2952787, at *14 (E.D. Mo. July 30, 2008) (PBM not fiduciary as to its compensation where it retained interest earned on rebates, and contract addressed payment of rebates to plan but not interest); *Moeckel*, 622 F. Supp. 2d at 680, 690 (PBM not fiduciary

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

where it retained interest on rebates, and PBM had no contractual obligation to pass on interest that it earned on rebates).

Even if participating employers had ***not*** approved Sequoia's receipt of commissions (or the specific commission rate), they unquestionably approved the purchase of such insurance and Sequoia did not—and cannot—become a fiduciary merely by receiving commissions from an insurer in connection with that purchase. A service provider who arranges to receive commissions (or revenue sharing) from an insurer (or investment provider) dealing with a plan exercises no control over plan assets and thus is not a fiduciary. *See*, *e.g.*, *Mahoney*, 564 F. Supp. 2d at 257 (finding that insurance broker through whom insurance coverage was placed was not fiduciary in connection with plan's purchase of the policy, or approval of the policy premiums or commissions, where broker did not have the authority or ability to cause the plan to purchase the policy or pay the premiums).

The same principle has been recognized in other contexts. Where a plan service provider receives a payment from a third party (and not from plan assets), the mere receipt of that payment (and the provider's negotiation with the third party to receive that payment) does not render the provider a fiduciary where the payment is triggered by a decision made by the plan fiduciary (and not the provider). *See In re Fidelity ERISA Fee Litig.*, 990 F.3d at 59 (holding that a service provider did not act as a fiduciary when it negotiated for and received "infrastructure fees" paid by third party mutual funds it made available to plan customers); *Hecker*, 556 F.3d at 584 (neither recordkeeper nor investment fund were fiduciaries in determining how non-plan asset revenue sharing from plan investments in their funds would be shared among them, because they did not exercise discretion over the disposition of plan assets); *Mulder v. PCS Health Sys., Inc.*, 432 F. Supp. 2d 450, 459-60 (D.N.J. 2006) (PBM "did not acquire fiduciary status or have discretionary authority over plan assets simply by contracting to receive its compensation for services through drug manufacturer rebates").

Here, RingCentral was offered—and agreed to pay—a premium in exchange for the insurance coverage options that ***RingCentral selected***. *See* Ex. 1, Program Agreement, Schedule A, ¶ 9 (providing that employers "must submit to the Anthem underwriting process and will receive group rates based on demographics, claims experience, and other factors"). Sequoia expressly disclosed, and RingCentral

29                          Case No. 3:21-CV-00227-JSC

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

agreed, that Sequoia would receive commissions from insurers.  *See* Ex. B, RingCentral Services Agreement, § 5.  Indeed, while Plaintiffs claim that Golub determined the compensation payable to Sequoia, *see* Am. Compl. ¶ 38, this allegation is contrary to the Services Agreement, which expressly provides that **RingCentral** determined the scope of Sequoia's compensation when it authorized Sequoia to receive commissions from third-party insurance companies.  Further, there is no reasonable dispute that the commission amounts at issue were **annually** disclosed to RingCentral (and other participating employers), and **publicly** reported on Form 5500s filed with the U.S. Departments of Labor and Treasury, as required by ERISA and its implementing regulations.

In sum, Sequoia did not act as a fiduciary regarding the conduct at issue and, accordingly, Plaintiffs' claims fail as a matter of law.  *See Wright*, 360 F.3d at 1101-02 (affirming dismissal, with prejudice, of fiduciary breach and prohibited transaction claims when the plaintiff "failed to establish that the [defendant] is a fiduciary").  The Court provided Plaintiffs with clear direction regarding the pleading deficiencies to be cured in any amended complaint.  The Amended Complaint suffers the same infirmities as the initial complaint and thus should be dismissed with prejudice.

## IV.    CONCLUSION

For the reasons explained above, Defendants respectfully move for dismissal of Plaintiffs' Amended Complaint with prejudice.

Dated:  July 30, 2021

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
JEFFREY S. BOSLEY

GROOM LAW GROUP, CHARTERED
DAVID N. LEVINE
MARK C. NIELSEN
SARAH M. ADAMS
KARA P. WHEATLEY
PAUL J. RINEFIERD
LENA KETTERING

By:  */s/ Jeffrey S. Bosley*
        Jeffrey S. Bosley
Attorneys for Defendants
SEQUOIA BENEFITS AND INSURANCE
SERVICES, LLC and GREGORY S. GOLUB

MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT